[No. 1041.  Decided January 9, 1894.]

*In the Matter of the Estate of John T. Wilbur, deceased:*
SARAH J. WILBUR, *Appellant*, v. C. E. BINGHAM, *Respondent.*

MARRIAGE WITH INDIAN — VALIDITY — ADMINISTRATON OF DECE-
DENT'S ESTATE — JURISDICTION.

The marriage of a white man to a Swinomish Indian woman, although contracted on the reservation of that tribe and pursuant to its customs, was void if celebrated while the territorial law of 1866 forbidding marriges between Indians and white persons was in force, as, under the organic act of this territory and the treaty with said tribe, such reservation was left within and a part of the territory, for all legislative and judicial purposes not affecting the personal rights and the lands and other property of the Indians.

The fact that the law forbidding a white person to marry an Indian was repealed within a short time after the celebration of such forbidden marriage, and that cohabitation was continued subsequent to such repeal, would not constitute a marriage.

Where the court acquires jurisdiction of a decedent's estate through a petition for the appointment of an administrator, which it denies, the court has power to proceed regularly to final distribution, although the widow of the decedent may protest against any administration.

*Appeal from Superior Court, Skagit County.*

*Million & Houser,* for appellant.

*Sinclair & Smith,* for respondent.

The opinion of the court was delivered by

STILES, J.— The disposition of this appeal depends upon whether there was a marriage between the deceased, John T. Wilbur, and a Swinomish Indian woman, "Kitty," who, with her sons by said John T., proposes the respondent as administrator of the estate. Appellant claims administration for herself, if any be granted, as the only lawful wife of the deceased.

In 1867 the Swinomish tribe were treaty Indians, residing upon the reservation set apart for them on Fidalgo Island, Skagit county, by a treaty ratified by the United States senate and proclaimed by the president in 1859. Abbott's Real Prop. Stat., p. 1123. Kitty, then about thirteen years of age, lived with her parents on the reservation, and Wilbur, who had been a resident of the territory for some time, lived on government land which he had taken up at a few miles distance therefrom. At that time there were almost no white women in the country, and many of the men had Indian women living with them. Wilbur became desirous of having the company of a "klootchman," and selected Kitty for that purpose, and made such arrangements with her father and the authorities of the tribe, that she left the reservation and went to his place, and there lived with him for about nine years. She then left him, probably at his suggestion, and returned to the reservation, and he soon after married the appellant.

It is not contended that the relations which existed between this man and woman were preceded by any statutory marriage, or that they were attended by any such circumstances as would have amounted to a common law marriage had such an institution been recognized here. They lived together and had children born to them, and that was all. But it is very strenuously urged, and the court below so found, that there was a binding marriage ceremony between them upon the reservation, according to the customs of the Swinomish tribe, and without entering into details, which amounted to little or nothing beyond the payment of a certain sum of money to the girl's father and his directing her to go with the white man, we think it may be conceded that all of the requirements necessary to constitute a valid Swinomish marriage were complied with, and that in the eye of the Swinomish law these two persons would have been considered man and wife. Had they both

been Indians, such would undoubtedly have been the case, and the general holdings of the courts would have recognized the relation. *Kobogum v. Jackson Iron Co.*, 76 Mich. 498 (43 N. W. 602).

Marriages of this kind have been upheld when they existed between a white man and an Indian woman. *Johnson v. Johnson's Adm'r*, 30 Mo. 72 (see notes in 77 Am. Dec. 606); *Wall v. Williams*, 11 Ala. 839. Though the contrary has been as stoutly maintained. *Roche v. Washington*, 19 Ind. 53; *State v. Ta-cha-na-tah*, 64 N. C. 614; *Dupre v. Executor of Boulard*, 10 La. An. 411.

The general rule is that the *lex loci contractus* is controlling, in adjudications involving the validity of marriages (*True v. Ranney*, 21 N. H. 52; Story, Confl. Laws, § 113), though this doctrine has an important exception, which is involved in the case before us. Appellant claims that inasmuch as, at the time of the alleged marriage, there was in this territory a statute prohibiting a marriage between a white person and an Indian (Acts 1866, p. 81), even considering the reservation as a foreign jurisdiction, the marriage was void, because Wilbur thereby committed a fraud upon the law of his domicile, which was the territory. Where a marriage is prohibited, either by the statute or by those rules of morality and decency which make it against the natural law of civilized nations for two persons to marry, as incestuous or polygamous marriages, it is in vain for them to go beyond their domicile, to engage in a contract of marriage, for the purpose of avoiding the prohibition. Their contract will be held void upon their return. *Kinney's Case*, 30 Grat. 858; *State v. Kennedy*, 76 N. C. 251; *State v. Bell*, 7 Baxt. 10; *Pennegar v. State*, 87 Tenn. 244 (10 S. W. 305); Whart. Confl. Laws, § 181; *Brook v. Brook*, 9 H. L. Cas. 223. In Massachusetts the contrary was held, in *Medway v. Needham*, 16 Mass. 157, and that case was followed there until a statute interfered.

See notes to same case, 8 Am. Dec. 133. In some courts a marriage contracted without the state, by a person under statutory disability, with another, whose domicile was in the foreign state, has been equally subjected to a declaration of invalidity. But this seems a harsh rule, as it might involve a perfectly innocent man or woman in unmerited confusion and disgrace; and the contrary was held in a very learned and conclusive opinion of Chief Justice GRAY in *Commonwealth v. Lane*, 113 Mass. 458. Respondent insists that this more lenient rule should be followed in the case of a marriage between a white person and an Indian upon a reservation; the *locus* being considered analogous to a foreign state, and the Indian custom the *lex loci*. *Morgan v. McGhee*, 5 Humph. 13, sustains the proposition, and *Johnson v. Johnson's Adm'r*, 30 Mo. 72, *Boyer v. Dively*, 58 Mo. 510, and *La Riviere v. La Riviere*, 77 Mo. 512, go further, and hold that although there may have been no reservation at the place where the marriage took place, if it occurred in what used to be termed "Indian country," it was sufficient, if the Indian customs were followed, although, under those customs, husband and wife could separate at will, and marry again. In none of the cases cited, however, does there appear any intimation that any law of the state was violated by the marriage of a white man with an Indian woman, and in Missouri the doctrine of common law marriages has always been recognized. *Cargile v. Wood*, 63 Mo. 501; *Dyer v. Brannock*, 66 Mo. 391. But there was a prohibition in our territorial statute of 1866, and the final question is whether it had any force within the Swinomish reservation, so as to render void any marriage between Wilbur and Kitty, however celebrated.

It has always been conceded that congress had the right, when a new territory was organized, to exclude from its jurisdiction any lands embraced within the territorial limits,

for any reason which it saw fit.    More frequently than in any other cases, this exclusion was provided for as to lands embraced in Indian reservations.    But it has not been by any means universal that either the civil or the criminal laws of a territory have been without force within the boundaries of an Indian reservation; and whether they have had such force or not has depended upon the acts of congress concerning the territories and public lands, and the treaties with various tribes providing for reservations. In *Harkness v. Hyde*, 98 U. S. 476, it was held that process from a district court of Idaho could not be served within the Shoshone reservation, in that territory, because the act of congress of March 3, 1863, organizing the territory, provided that it should not embrace within its limits or jurisdiction any territory of an Indian tribe, where, by a treaty with such tribe, their reservation was not to be included within the territorial limits or jurisdiction of any state or territory without their consent, and because, five years later, a treaty was made with the Shoshone Indians, whereby it was agreed that no persons, except agents of the government, should be authorized to pass over, settle upon or reside in the territory reserved.    The court said that this territory "was as much beyond the jurisdiction, legislative or judicial, of the government of Idaho, as if it had been set apart within the limits of another country, or of a foreign state."    But in *Langford v. Monteith*, 102 U. S. 145, the court acknowledged having made a mistake in the former case, in finding the existence in the treaty of the clause mentioned, and held that where no such clause, or language equivalent to it, was found in a treaty with Idaho Indians, the lands held by them were a part of the territory, and subject to its jurisdiction, so that its process could run therein, although the Indians themselves might be exempt from such jurisdiction.    In *United States v. McBratney*, 104 U. S. 621, held, that the United States

circuit court for the district of Colorado had no jurisdiction of a case of murder committed by one white man upon another within the Ute reservation, because the act of March 3, 1875, authorizing the admission of Colorado as a state, contained no exception of jurisdiction over the reservation, such as had been made in the treaty with the Indians, but that the state courts, alone, could try the accused for the offense. An examination of the organic act of Washington Territory shows only this in regard to Indians and their lands:

"*Provided*, That nothing in this act contained shall be construed to affect the authority of the government of the United States to make any regulations respecting the Indians of said territory, their lands, property or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never been passed." 10 St. at Large, 172.

No act amending or enlarging this proviso came into operation until 1875, when Rev. St. U. S., § 1839, was made applicable to all the territories. In the mean time the treaty with the Swinomish Indians was made, taking effect April 11, 1859. This treaty ceded to the government all the land formerly inhabited by the tribes of Indians joining therein, on both sides of Puget Sound, from Vashon Island northward to British Columbia, and from the summit of the Cascade mountains to the divide between Hood's canal and Admiralty inlet, but reserved to them certain defined tracts, in these words, following the description:

"All which tracts shall be set apart, and so far as necessary surveyed and marked out for their exclusive use; nor shall any white man be permitted to reside upon the same without permission of the said tribes or bands, and of the superintendent or agent; but, if necessary for the public convenience, roads may be run through the said reserves, the Indians being compensated for any damage thereby done them."

This language, both of the organic act and of the treaty,

was wholly different from that concerning the Idaho or Colorado Indians, and under *Langford v. Monteith* and *United States v. McBratney, supra,* must be taken to have left the reservation within, and a part of, the territory, for all legislative and judicial purposes not affecting the personal rights and the lands and other property of the Indians. Whether these could have been controlled by territorial statutes, we do not pretend to decide.   But it must be, it seems to us, by every rule of jurisdiction, that when Wilbur went upon the reservation, even if he went there with the full purpose of procuring Kitty to be his wife, the law of the territory met him there, in all its force, and prohibited him from making a legal marriage with her, under any forms or ceremonies whatever; and she, although an Indian and a mere child, was bound to know that the same prohibition attached to her.   Therefore the only attempt to constitute a marriage between them was void, and the fact that the prohibiting statute was repealed a short time after they commenced to live together, viz., in 1868, made their case no better, since all that appears in the record concerning them subsequently is that they cohabited, and cohabitation did not constitute a marriage.   *In re McLaughlin's Estate,* 4 Wash, 570 (30 Pac. 651).

The order of the superior court, granting letters of administration to respondent, must be reversed, and the matter remanded, with direction to grant letters to appellant, if she be still capacitated; otherwise, to some other suitable person, as provided by law.   Appellant protests against any administration, but we regard this as one of the cases where such a proceeding is most fitting, since deceased may have left heirs who are entitled to share in his estate, or there may be creditors who are unpaid.   The court acquired jurisdiction of the estate through respondent's petition, and should now proceed regularly to final distribution.

HOYT and SCOTT, JJ., concur.

DUNBAR, C. J., and ANDERS, J., not sitting.