# FREDERICK P. DIMPFEL, JR., ET AL. *vs.* GEO. W. WILSON, TRUSTEE, ET AL.

*Divorce—Extra Territorial Effect of Decree Prohibiting Re-Marriage of Guilty Party—Legitimacy of Children—Proof of Law of Another State.*

A decree in a divorce suit which prohibits the defendant from again marrying during the lifetime of the plaintiff has no effect beyond the limits of the State in which such decree is made, and does not in itself render invalid the re-marriage of the defendant in another State, when such marriage would otherwise be valid.

D's wife obtained a divorce *a vinculo* from him in New York by a decree which dissolved the marriage and prohibited D from re-marrying during the lifetime of the plaintiff. Under the New York statute, as construed by the Courts of that State, such decree did not operate to restrain D from marrying in another State. Afterwards, D married again in the District of Columbia, while his former wife was still living. The Act of Congress relating to the District of Columbia (12 U. S. Statutes At Large, 59) provides that it shall be a ground of divorce if the marriage was contracted while either party thereto had a former wife or husband living, unless the former marriage shall have been dissolved and no restraint shall have been imposed upon the party contracting such second marriage. *Held*, that D's second marriage was not void but only voidable upon a bill for a divorce, and that the issue of that marriage is legitimate, unless the construction placed in the District

of Columbia upon the Act of Congress be to the effect that the restraint imposed by the decree of the New York Court operated in the District of Columbia to render the re-marriage there null and void.

The construction placed upon the statutes of another State by its Courts, and the common law of that State, may be proved by the testimony of Judges or lawyers of that State.

*Decided January 9th, 1908.*

Appeal from the Circuit Court for Talbot County (PEARCE, C. J., ADKINS and CROTHERS, JJ.)

The cause was argued before BOYD, C. J., BRISCOE, SCHMUCKER, BURKÉ and WORTHINGTON, JJ.

*James C. Mullikin* and *Geo. Stewart Brown*, for the appellants.

*Harrison W. Vickers* and *Wm. H. Cooper, Jr.*, (with whom was *H. W. Vickers, Jr.*, on the brief), for the appellees.

*Joseph B. Seth*, filed a brief for G. W. Wilson, trustee.

BOYD, C. J., delivered the opinion of the Court.

This appeal is from a decree dismissing the bill of complaint filed by the appellants against the appellees in the Circuit Court for Talbot County and also a special case stated, hereinafter referred to. In 1893 Frederick P. Dimpfel died leaving a last will and testament, by the eighth clause of which he devised and bequeathed his property to William R. Martin *in trust* to pay one-half of the net income to his son, Frederick P. Dimpfel, Jr., for life, and in the event of his death in the lifetime of his wife, Teresa G., to pay the income to her for the support of herself and children during her widowhood, and until the youngest child attained the age of twenty-one years, and made certain other provisions not necessary to mention. Then by the *same clause* he directed the other half of the net income to be paid to his son, William O'S. Dimpfel, for life, and in case he died in the lifetime of his wife then that said half of the income

should be paid to his wife, Maria P., during her life or widow-hood for the support of herself and any child or children William might leave.   That clause thus concludes: "In the event, however, that my said son William should die leaving any child or children, or the child of any child or children, I direct that said one-half of the income aforesaid *to* be paid to the said Maria P. Dimpfel during her widowhood and until the youngest child shall have attained the age of twenty-one years, at which time I direct the said one-half of my estate to be given to said child or children of my said son William upon the express condition that said child or children shall secure to the said Maria P. Dimpfel one-third of the income she had before been receiving and pay the same during her natural life or widowhood."   Provision was also made that in the event of William not leaving any child, his half should go to Frederick, after the death or marriage of Maria P., upon the same conditions and limitations set forth as to his own half.

WIlliam and Maria P. were married in the city of Washington, D. C., on September 5th, 1890, and had one child—Maria Trimble Dimpfel—who is still living and is thirteen years of age.   William died September 7th, 1904, and William R. Martin having died, George W. Wilson was by decree of the Court substituted in his place.   William had been previously married to Minnette G. Dimpfel who obtained a divorce *a vinculo matrimonii* from him on February 27th, 1890, in the State of New York.   In the decree of divorce it was provided that "it shall not be lawful for the said William O'S. Dimpfel, the defendant, to marry any other person until said Minnette G. Dimpfel, the plaintiff, shall be actually dead." She was living, as we understand she still is, when William and Maria P. were married in the District of Columbia—said Maria P. having after the death of William married Edward Woodall.   The bill alleges that by reason of the provision in the decree and the law of the District of Columbia, in force at the time of the alleged marriage, the marriage between Maria and William was unlawful, and said Maria was not the lawful

wife of William and Maria T. was not his lawful child or heir,
or capable in law of taking through him, or under said will,
any portion of the said estate.    It is then alleged that the one-
half of the estate set apart for William and his family would
pass, under the trusts of the will, to be held for Frederick and
his family in the same manner that the one-half was originally
set aside for them, and there is a prayer that it may be so
decreed.

Prior to the filing of the bill a special case stated was insti-
tuted in the Circuit Court for Talbot County, wherein Maria
G. Woodall and husband and Maria T. Dimpfel, by her next
friend were plaintiffs, and George W. Wilson, as trustee
under the will of Frederick P. Dimpfel, Sr., and as adminis-
trator of the estate of William, was defendant.    There was
also filed with it what is called the testamentary paper of
Frederick P. Dimpfel, dated December 20th, 1892.    The parties
to that special case stated submitted to the Court the con-
struction of the last clause of item eight of the will, the legal
effect of the second testamentary paper and the rights of
Maria P. Woodall and Maria T. Dimpfel.    The bill alleges
that the complainants were not made parties to the case stated
and that no adjudication of the points raised in it should be
had, other than in this suit, and prays that the hearing of it
may not be had until the proofs are taken and the hearing
had under this bill.    After answers were filed testimony was
taken in open Court and the case was heard, resulting in a
decree dismissing the bill which decree was subsequently
amended by also dismissing the case stated.    From the decree
as amended this appeal was taken.

The most important question raised in the case is the effect
of the marriage of William and Maria in the District of Col-
umbia, notwithstanding the provision in the decree of divorce
in the New York Court prohibiting William from marrying
during the lifetime of his former wife, and we will therefore
first consider that.    It cannot be denied that the general rule
is that such a prohibition has no extra-territorial effect.    That
seems to be recognized very generally throughout this coun-

try.   See 14 *Cyc.*, 729, and 9 *Am. & Eng. Ency. of Law*, 854, where many cases can be found cited in the notes to those volumes.   It was held in *Elliott* v. *Elliott*, 38 Md. 357, that the Act of 1872, ch. 272, formerly in force in this State, was not penal in its nature and therefore was not an *ex post facto* law, and hence it applied to all cases where a divorce *a vinculo*, for the causes mentioned, should be decreed after the Act went into effect—although the evidence related to acts done prior to that time.   That was all that was involved in that case.   The reasoning of the Court was very clear and the conclusion is not in conflict with the general rule above stated.   The statute provided that "in all cases where a divorce *a vinculo matrimonii* is decreed for adultery or abandonment, the Court may, in its discretion, decree that the guilty party shall not contract marriage with any other person during the life time of the other party; *in* which case the bonds of matrimony shall be deemed *not to be dissolved*, as to any future marriage of such guilty party, contracted in violation of such decree, or in any prosecution on account thereof." This Court said that the statute did not impose any new punishment or penalty upon the adulterer, but it merely left him where he was before the decree, and withheld from him relief which he was not as a matter of right entitled to.   Having entered into the marriage contract, he was not entitled to be relieved from it, excepting in so far as the law furnished a remedy, and the statute only gave relief to the innocent party, provided the Court, in its discretion, so directed.   But it was concluded that such a law was not desirable in this State, and it was repealed by the Act of 1888, ch. 486.   It was an anomalous condition, that the law should provide that the bonds of matrimony should be deemed dissolved as to one of the contracting parties, but should be deemed *not* to be dissolved as to the other.   In *Garner* v. *Garner*, 56 Md. 127, it was held that the part of the decree which prohibited the wife from marrying again was invalid, because she was not a resident of this State and was not brought into Court by personal service. That was because such a provision in a decree is a decree *in*

*personam* and does not merely determine the *matrimonial status* of the parties.   As these are the only cases on the subject in this State, it will be seen that there is nothing in the decision of this Court which could affect the general rule announced above.   The policy of this State, as manifested by the repeal of the previous law, was at the time of this marriage that no such prohibition should be imposed and there can be no reason for its Courts construing such a statute to be extra-territorial.

. But what should properly govern us in this case is the law of the District, when the marriage took place, and the construction placed upon the statute of New York, where the decree was passed.   The Act of Congress of June, 1860, ch. 158, U. S. Statutes at large, vol. 12, p. 59, provides not for a decree of nullity, as the appellants incorrectly contend, but as *a ground for divorce*, that when "such marriage was contracted while either of the parties thereto had a former wife or husband living, unless the former marriage shall have been lawfully dissolved, and no restraint shall have been imposed upon the party contracting such second marriage."  That Act was in effect when the marriage now in question took place.   When we remember that the rule is, as stated in 14 *Cyc.*, 729, that: "A statute prohibiting the re-marriage of a divorced person in the lifetime of the former spouse does not operate where the divorce was [obtained in another State; nor does it operate against a re-marriage in another State, even though the parties go there to evade the law of their domicile," it cannot be presumed that Congress intended this Act, passed for the District of Columbia, to apply to such restraint imposed by a Court outside of the District.   The Act of Congress did not declare a marriage so made null and void, but only provided that such a marriage, as the Act had relation to, would be a ground for divorce.   There is a marked difference between the marriage of a person, who has been previously married, and who has not been divorced from a spouse who is still living, and that of one who has been divorced but was prohibited by a decree from re-marrying—the one case would be

clearly polygamous, while the other would not be under the general rule, if the second marriage occurred outside of the State where the decree was passed.

If in this case the decree had in terms limited the restriction upon William to re-marrying within the State of New York, this Act of Congress unquestionably would not have applied to a marriage by him in the District of Columbia, because there would have been no restraint imposed upon him that would have prevented such marriage. And while it is true that the decree did not on its face so limit the restriction, it was passed after the Court of Appeals of that State had construed the statute not to apply to a marriage outside of the State. In *Van Voorhis* v. *Brintnall*, 86 N. Y. 18 (decided in 1881) that Court, after reviewing many decisions, announced the law for that State in language not to be misunderstood. It was there decided that when a marriage between E and B had been dissolved, on the ground of the adultery of the latter, a child of a second marriage, born in New York, was legitimate and entitled to share with the children of the first marriage in a devise to the issue of B—although the decree of divorce adjudged that he should not re-marry during the lifetime of E, and thereafter he went to Connecticut and married I, both being residents of New York, and, having gone out of the State for the purpose of evading its laws, they returned the same day and resided in New York. It was further held that the statutes prohibiting the second marriage of the person divorced on the ground of adultery, during the lifetime of the former spouse, and declaring such second marriage void, had no application, as they were in the nature of a penalty, and had no effcect outside of the State, in the absence of express terms showing a legislative intent to give them such effect. That case was approved in *Thorp* v. *Thorp*, 90 N. Y. 602, and *Moore* v. *Hegeman*, 92 N. Y. 521—both of which were also prior to this marriage. There was, then, no restraint upon William from marrying in the District of Columbia imposed by the decree passed when he was divorced. The decree provided that the marriage between Minnette and William "be dissolved, and the

same is hereby dissolved accordingly, and the said parties are and each of them is freed from the obligations thereof." It is true that it then went on to say that it should be lawful for Minnette to marry again, but that it should not be lawful for William to marry any other person until she was dead, but the construction placed on the statute, under which the decree was passed, by the highest Court of that State,. must be taken in connection with the language used in the decree. The Court of Appeals having said in the cases cited that a restriction could not properly be imposed so as to make it binding beyond the State, the Court which passed this decree must be presumed to have imposed the restriction subject to that qualification.

Such being the law of New York, as well as most of the States of this country, it cannot properly be said that the Act of Congress really intended that a decree of nullity, and not for a divorce, should be passed. Indeed that could not well be, unless Congress had declared that such a marriage should be null and void, and we have been referred to no such Act of Congress, and know of none. It is one thing to prohibit a marriage and declare it null and void if made under certain · conditions, and quite another to authorize a divorce—thereby making it voidable only and not *ab initio* void. Our predecessors in *Harrison* v. *State, use of Harrison*, 22 Md. 468, were called upon to determine the legitimacy, *vel non*, of children under these circumstances. The statute declared that, "If any person within this State shall hereafter marry with any person related within any of the degrees of kindred or affinity expressed in the following table, such marriage shall ·be void." The next section imposed a penalty upon parties convicted of marrying within certain prohibited degrees, and another provided that: "If any person shall go out of this State and there marry with any person belonging to this State, contrary to this Act, each of said parties shall be liable to the same punishment or penalty, as if the offense had been committed within this State." Robert Harrison married his niece, Martha (which was prohibited by the statute), i n th

District of Columbia—both of them being residents of Maryland. They returned to Maryland where they resided until Robert died, leaving children by said cohabitation. The Court held that the marriage "was not *ipso facto* void, but only voidable upon judgment or decree for that purpose found or passed during the lifetime of the parties." The Court reviewed at length the British Statutes, and decisions concerning them, and discussed the distinction between canonical disabilities, which rendered a marriage voidable and not void, and civil disabilities which *ipso facto* avoided it, without the action of the Courts. The Court said: "It cannot escape observation that if the Act of 1777, ch. 12, makes all such marriages void, the consequence is the issue of all such marriages is bastardized, and the saving of the rights of children and widows, under the distinction between voidable and void marriages, which the canon law protected, unless the marriage was dissolved during the joint lives of the parties is lost. Such a construction is so pregnant with serious consequences as not to be adopted without the most cogent and conclusive authority." While that case is of course not conclusive of this, and not wholly applicable, it shows the anxiety of our predecessors to protect innocent issue from being pronounced illegitimate, by not being willing to declare such marriages void *ab inito*—notwithstanding the language used in the statute when other parts of the statute and the circumstances permitted a construction which made them only voidable. In this case, where there is no Act of Congress declaring the marriage void, but the one in evidence distinctly provides for a divorce, and not for a decree declaring the marriage to have been a nullity, it would be unauthorized and unjust to place such a construction upon it as would result in declaring this innocent child illegitimate because her parents had married lawfully as they doubtless believed in Washington, instead of in their own State where they could have lawfully married, especially as it would be necessary in order to do so to hold that it was intended to include a divorce, such as this, granted by a Court of another jurisdiction. We do not deem the

latter to be the proper construction of the Act of Congress, but if that be conceded, for the purposes of this case, we think it clear that the Act means what it says—that *a divorce* and *not a decree of nullity* could have been obtained under that Act of Congress, in which event the legitimacy of the child could have been preserved.

It is contended that inasmuch as at common law divorces *a vinculo matrimonii* were not granted for adultery, we must presume that the common law was still in force, and hence a divorce on that ground would not be recognized in the District. But if there were no other answer to that the Act of Congress would be sufficient, as it expressly provides that a divorce from the bonds of matrimony could be granted "where either party has committed adultery during the marriage." In the face of such a provision it cannot be presumed that the common law on that subject was still in force. What was said in *Moore* v. *Hegeman, supra,* is very apposite: "The counsel for the appellants further claims that at common law the marriage which is now claimed to be valid would be null and void, and that inasmuch as the State of New Jersey has with great fidelity and consistency adhered to and followed common-law rules, and its legislature has enacted a statute upon the subject, it is very important to consider the common law as it previously existed, in the interpretation of the statute. The object of a statutory enactment is sometimes to change the common-law rule, and where that is the case such rule is not a proper subject of consideration in the interpretation of the statute, and it cannot be said in this case that the common law is presumed to exist, for there is no absence of statutory provision on the subject. As the statute has superseded and taken the place of such a rule and established another and a different one, it should be considered in accordance with its intention and the purpose which it was designed to accomplish."

As the case is presented we would have no hesitation about affirming the decree, as we not only have the views above indicated on the main question, but also are of the opinion that the Court was right in dismissing the special case stated.

The questions therein presented could not be properly disposed of in the absence of necessary parties, and if the complainants are desirous of being made parties to such a proceeding, it must be done in some way other than by a bill such as this.

The only difficulty we have had is caused by the rulings of the lower Court on the offer of the testimony of Mr. Glasse, a member of the bar of the District of Columbia, who has been in the active practice of his profession since 1894, as shown by the record. Some of the questions propounded to him we regard as irrelevant and immaterial. For example the 2nd, 12th and 13th were so, because by agreement ot counsel the statutes were offered in evidence, and the Court states in the bill of exceptions that it was agreed they contained all the statute law upon the subject. Nor can we see how the third, fourth, fifth and sixth can throw any light on the subject. The third omitted all reference to a divorce, and the other three related to decrees, etc., of the District Courts. The answer to the ninth, which was allowed, together with the Court's statement in connection with the tenth, sufficiently covered the seventh, eighth and tenth. The eleventh, as stated in the record, is difficult to understand. It is perhaps improperly printed, but in its present shape it could not properly be asked. The first and fourteenth present the difficulty we refer to. The reasons of the Court for sustaining the objection to them were to the effect that is was not permissible to prove by Mr. Glasse the construction of the statutes and the common law of the District, but that must be done by the production of adjudged cases. We do not so understand the authorities. The rule is thus stated in 2 *Poe*, sec. 272: "If the matter to be proved is the existence and effect of foreign laws or customs, the proof as to unwritten laws must be furnished by experts, viz.: lawyers or judges, or both. As to written or statute law it must be furnished by a duly authenticated copy of the law in question, together with such explanation of its meaning and construction as may be furnished by experts. In both cases the testimony is addressed to the

Court and not to the jury. The statute laws of the several States may also be read from the authorized publications." It was said in *Gardner* v. *Lewis*, 7 Gill, 377, quoting from the syllabus, that: "Reports of adjudged cases are not evidence of what is the law of the State or country in which they are pronounced. The written law of foreign countries should be proved by the law itself as written, and the common, customary or unwritten law by witnesses acquainted with the law." It is not easy to understand why such rule as originally adopted should be continued now when we have ready access to the reported decisions of other Courts. Cases involving matters of great moment are frequently decided in accordance with those adjudged by other Courts, as found in their reports. We have cited above the New York and other decisions on the effect of the restraint imposed by the decree in question, and it is very usual in deciding questions of importance to refer to the reports of decisions of Courts of other States and countries, which we assume to correctly state the views of the Courts rendering them. It was said in *State* v. *Buchanan*, 5 H. & J., 356, "it is to judicial decisions that we are to look for the common law itself, which is no where to be found, but for the evidence of it." *Gardner* v. *Lewis* has been cited with approval over and over again in this State. *Green* v. *Treiber*, 3 Md. 11; *Wilson* v. *Carson*, 12 Md. 54; *B. & O. R. R. Co.* v. *Glenn*, 28 Md. 287; *Zimmerman* v. *Helser*, 32 Md. 274; *Jackson* v. *Jackson*, 80 Md. 191; and other cases have followed it. See also 16 *Cyc.* 886; 6 *Am. & Eng. Ency. of Law*, 289; 12 *Ibid*, 431; *State* v. *Behrman*, 25 L. R. A. 449; *Cherry* v. *Sprauge*, 67 L. R. A. 33, and notes. Of course as was done in 28 Md. *supra*, the parties can agree that decisions of another State be read, to prove what the law is in such State, and in a number of States statutes have been passed authorizing them to be used as evidence.

It is possible that Mr. Glasse may be able to give the Court some information that would present the case differently from what the record now does, and as we are of the opinion that it was permissible to examine him as an expert we have de-

termined to remand the case under sec. 38 of Art. 5 of the Code, without reversing or affirming the decree, in order that his testimony may be taken within such time as the lower Court may allow.    We adopt this course because we are convinced that the pivotal point in the case is whether the marriage in Washington was valid, and, although we find there was error in rejecting the testimony of Mr. Glasse, as above pointed out, we are not satisfied, by reason of his answer to the tenth question and of the fact that the statutes are in evidence, that the testimony will be of any avail to the complainants, or that they were injured by the action of the Court, especially as it offered to admit any adjudged cases cited by the witness. In view of the well established doctrine that a decree imposing a restraint, such as the one before us, is not extraterritorial, and what seems to us to be the proper construction of the Acts of Congress in evidence, it is scarcely possible that anything but decisions of the District Courts to the contrary could alter our views of the law, but we deem it proper that the appellants should have the opportunity of presenting such evidence on the subject as they were entitled to do as above announced.

> *Cause remanded, without affirming or reversing the decree, the costs above and below to abide the final result.*