(134 So. 651)
## SMITH v. GOLDSMITH et al.
### 8 Div. 248.

Supreme Court of Alabama.
March 5, 1931.

Rehearing Denied May 28, 1931.

156

Watts & White, of Huntsville, for appellant.

Lanier & Pride and Brickell & Johnston, all of Huntsville, for appellees.

GARDNER, J.

But one question is presented by this appeal. Is Irene Kennemer Smith (so designat-

ed in the present record and in the will of decedent) the lawful widow of Robert Earl Smith, deceased? The two divorce decrees against said Robert Earl Smith were each silent as to his right to remarry and no such direction has been made by any subsequent order of the court.

Under the previous decisions of this court (construing section 7410, Code 1923, in connection with sections 3440 and 3441), the marriage in Alabama of petitioner (Irene Kennemer Smith) and Robert Earl Smith would have been void. Barfield v. Barfield, 139 Ala. 290, 35 So. 884; Gulf States Steel Co. v. Witherspoon, 214 Ala. 529, 108 So. 573; Evans v. Evans, 200 Ala. 329, 76 So. 95.

█ But the marriage took place in the state of Tennessee, and the applicable principle of law, generally recognized, is found stated in 38 Corpus Juris, 1276, as follows:

"The general rule is that the validity of a marriage is determined by the law of the place where it was contracted; if valid there it will be held valid everywhere. * * * An exception to the general rule, however, is ordinarily made in the case of marriages repugnant to the public policy of the domicile of the parties, in respect of polygamy, incest or miscegenation, or otherwise contrary to its positive laws."

█ Much evidence was offered tending to show the last divorce decree against Robert Earl Smith was on the ground of adultery with petitioner, and the statute of Tennessee was introduced which reads as follows: "When a marriage is absolutely annulled, the parties shall severally be at liberty to marry again; but a defendant who has been guilty of adultery shall not marry the person with whom the crime was committed, during the life of the former husband or wife." Shannon's Code, § 4228.

It is insisted, therefore, that the marriage was invalid under the law of Tennessee. But this statute had reference to those cases in which the decree of divorce was granted in that state, and not in other jurisdictions, nor with reference to those domiciled elsewhere.

Viewed otherwise from a practical standpoint, many obstacles may be noted in the application of such a statute. Illustrative is the instant case where the Tennessee court must ascertain that the person named "Vivian" in the evidence in the Alabama divorce suit was in fact this petitioner. But this aside, we think the opinion of the Tennessee court in Newman v. Kimbrough (Tenn. Ch. App.) 59 S. W. 1061, 52 L. R. A. 668, very clearly expresses the view that such a statute will not invalidate the marriage relation of those domiciled in another jurisdiction, though the divorce was obtained in the Tennessee courts. This is in accord with the general rule. 5 R. C. L. 1000. And upon the interpretation of such statutes as to the jurisdiction granting the divorce, the Supreme Court of Maine, in Inhabitants of Phillips v. Madrid, 83 Me. 205, 22 A. 114, 115, 12 L. R. A. 862, 23 Am. St. Rep. 770, said: "Our statute applies only to divorces granted by the courts in this state. It has no reference to a decree granted in another state." The holding of the Iowa court in Dudley v. Dudley, 151 Iowa, 142, 130 N. W. 785, 32 L. R. A. (N. S.) 1170, is to like effect. See, also, Dimpfel v. Wilson, 107 Md. 329, 68 A. 561, 13 L. R. A. (N. S.) 1180, 15 Ann. Cas. 753; State v. Bentley, 75 Vt. 163, 53 A. 1068. The Tennessee decisions relied upon by appellees (Newman v. Kimbrough, supra, and Pennegar v. State, 87 Tenn. 244, 10 S. W. 305, 2 L. R. A. 703, 10 Am. St. Rep. 648), involved cases where the parties resided in that state, and the divorces were obtained in that jurisdiction.

The parties to this marriage were residents of Alabama, to which state they immediately returned and remained domiciled, and the divorce decree was by the Alabama court. We are therefore of the opinion the prohibition of the Tennessee statute has no application to this case. The conclusion follows that the marriage was valid by the laws of Tennessee.

Upon the subject here under consideration the following observations found in Kent's Commentaries (vol. 2, 14th Ed. p. 92) have met with the approval of the decided weight of authority:

"As the law of marriage is a part of the jus gentium, the general rule undoubtedly is that a marriage valid or void by the law of the place where it is celebrated, is valid or void elsewhere. An exception to this rule is stated by Huberus, who maintains that if two persons, in order to evade the law of Holland, which requires the consent of the guardian or curator, should go to Friesland, or elsewhere, where no such consent is necessary, and there marry, and return to Holland, the courts of Holland would not be bound by the law of nations to hold the marriage valid, because it would be an act ad eversionem juris nostri. In opposition to this opinion, we have the decision of the court of delegates in England in 1768, in Compton v. Bearcroft, 2 Hagg. Cons. 443, 444, where the parties being English subjects, and one of them a minor, ran away, without the consent of the guardian, to avoid the English law, and married in Scotland. In a suit in the spiritual court to annul the marriage, it was decided that the marriage was valid. This decision of the spiritual court has been since frequently and gravely questioned. Lord Mansfield, a few years before that decision of the delegates, intimated pretty strongly his opinion in favor of the doctrine in Huberus, though he admitted the case remained undecided in

England. The settled law is now understood to be that which was decided in the spiritual court. It was assumed and declared by Sir George Hay in 1776, in Harford v. Morris, 2 Hagg. Cons. 428–433, to be the established law. This principle is that in respect to marriage the lex loci contractus prevails over the lex domicilii, as being the safer rule, and one dictated by just and enlightened views of international jurisprudence. This rule was shown, by the foreign authorities referred to by Sir Edward Simpson in 1752, in the case of Scrimshire v. Scrimshire, 2 Hagg. Cons. 412, 416, to be the law and practice of all civilized countries by common consent and general adoption. It is a part of the jus gentium of Christian Europe, and infinite mischief and confusion would ensue with respect to legitimacy, succession, and other rights, if the validity of the marriage contract was not to be tested by the laws of the country where it is made. This doctrine of the English ecclesiastical courts was recognized by the Supreme Court of Massachusetts in Medway v. Needham (16 Mass. 157, 8 Am. Dec. 131; Putnam v. Putnam, 8 Pick. 433), and though the parties in that case left the state on purpose to evade its statute law, and to marry in opposition to it, and, being married, returned again, it was held that the marriage must be deemed valid, if it be valid according to the laws of the place where it was contracted, notwithstanding the parties went into the other state with an intention to evade the laws of their own. It was admitted that the doctrine was repugnant to the general principles of law relating to other contracts; but it was adopted in the case of marriage, on grounds of public policy, with a view to prevent the public mischief and the disastrous consequences which would result from holding such marriages void. It was hinted, however, that this comity, giving effect to the lex loci, might not be applied to gross cases, such as incestuous marriages which were repugnant to the morals and policy of all civilized nations."

The general rule has its exceptions, one of incestuous marriages noted in the foregoing quotation, and others heretofore adverted to of polygamy, miscegenation, and where otherwise contrary to some positive statute or pronounced public policy of the state. We are not here concerned with any exception to the general rule save that of the latter class; that is, with reference to any pronounced public policy of the state as disclosed by statute.

It is urged that section 7410 of the Code 1923, construed in connection with section 3440 (our bigamy statute), declares the public policy of the state, leading to the conclusion of nullity of any marriage in contravention thereof, though contracted beyond this jurisdiction. But for a violation of the bigamy statute the second marriage must be unlawful. Parker v. State, 77 Ala. 47, 54 Am. Rep. 43.

The very question at issue in the instant case is the validity of the marriage, and the argument for appellees must at last rest upon a proper interpretation of section 7410, under the provisions of which, as disclosed by the undisputed proof, decedent was not permitted to again marry in this state. The case, therefore, resolves itself into a single question: Is this statute to be given extraterritorial effect? It is to be noted in the first place that the divorce is absolute, and statutory or decretal restrictions aside, both parties would be free to again contract marriage. 19 Corpus Juris, 182; note Boykin v. Rain, 65 Am. Dec. 357. The inhibition runs against the defendant to the divorce suit, and is rested upon no particular ground; the right to remarry is made to depend upon the sound judgment of the chancellor. The statute therefore indicates no declaration of a public policy, and must be construed in this respect as imposing a penalty only. Such statutes are not interpreted as having extraterritorial effect. 19 Corpus Juris, 183; Dimpfel v. Wilson, 107 Md. 329, 68 A. 561, 13 L. R. A. (N. S.) 1180, 15 Ann. Cas. 753. One of the leading cases so holding is that of Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505, though it must be conceded the statute there considered was much broader and more pointed in its restriction. Discussing such a statute, the court says: "Personal disqualifications arising, not from the laws of nature, but from positive laws, especially such as are of a penal nature, are strictly territorial and cannot be enforced in any country other than that in which they originated." Again reasoning to like result the opinion proceeds: "Now if the criminal court has no jurisdiction to punish the act when committed out of the State, how has the civil court jurisdiction to prohibit the doing of the act out of the State? The consequences are the same in either case, and are prescribed by the same statute. Whether a man is punished by fine and imprisonment, or by the disgrace of himself and the woman he married—the bastardy of his children—is a difference in degree only. The severer punishment is in the last alternative. Can the court imply the power to inflict it? Can it exist unless given by express language? I think not." The Vermont court, in State v. Shattuck, 69 Vt. 403, 38 A. 81, 82, 40 L. R. A. 428, 60 Am. St. Rep. 936, concludes to like effect, saying: Such statutes are not extraterritorial, unless made so by express words or necessary implication." The case of Lanham v. Lanham, 136 Wis. 360, 117 N. W. 787, 788, 17 L. R. A. (N. S.) 804, 128 Am. St. Rep. 1085, cited by counsel for appellee, is in harmony with this construction of a statute similar to ours, as noted by the following excerpt from the opinion in that case:

"A state undoubtedly has the power to declare what marriages between its own citizens shall not be recognized as valid in its courts, and it also has the power to declare that marriages between its own citizens contrary to its established public policy shall have no validity in its courts, even though they be celebrated in other states, under whose laws they would ordinarily be valid. In this sense, at least, it has power to give extraterritorial effect to its laws. The intention to give such effect must, however, be quite clear. So the question must be, in the present case, whether our legislature by the act quoted declared a public policy, and clearly indicated the intention that the law was to apply to its citizens wherever they may be at the time of their marriage. To our minds there can be no doubt that the law was intended to express a public policy. There have been many laws in other states providing that the guilty party in a divorce action shall not remarry for a term of years, or for life, and these laws have generally been regarded merely as intended to regulate the conduct of the divorced party within the state, and not as intended to follow him to another jurisdiction and prevent a marriage which would be lawful there; in other words, they impose a penalty local only in its effect. Under this construction the remarriage of such guilty party in another state has generally been held valid, notwithstanding the prohibition of the local statute. Of this class are the cases of Frame v. Thormann, 102 Wis. 653, 79 N. W. 39, Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505, and State v. Shattuck, 69 Vt. 403, 60 Am. St. Rep. 936, 38 A. 81, 40 L. R. A. 428, and others which might be cited."

These authorities are expressive of the generally accepted rule, as disclosed also by the following text of 5 R. C. L. § 84:

"It is almost universally conceded that statutes prohibiting the guilty party to a judgment of divorce from marrying again, either for a certain period, or while the other party to the former marriage lives, are without effect outside of the territorial limits of the prohibiting state. Since such a prohibition is in the nature of a penalty it does not apply to divorces granted outside of the state, nor does it carry any disability beyond the borders of the state where in force."

Our own court, in its early history, recognized this as the proper interpretation of statutes of this character, and so declared in Reed v. Hudson, 13 Ala. 570, and reiterated in Fuller's Adm'r v. Fuller, 40 Ala. 301, citing these two authorities, this court, in Wilson v. Holt, 83 Ala. 528, 3 So. 321, 328, 3 Am. St. Rep. 768, said: "It is said that the laws of Georgia prohibited the guilty party from marrying again, and for this reason the marriage of Dr. Wilson in Alabama was illegal.

But it is settled in this state that such a prohibition has no extraterritorial operation, and that, notwithstanding the prohibition, the guilty party would be competent to marry in the state of his or her residence." The principle was again recognized in McLaughlin v. McLaughlin, 201 Ala. 482, 78 So. 388, 389, the court saying: "The prohibition against her marrying again without leave of the court having no effect beyond the borders of this state."

In the still more recent case of Boyles v. Wallace, 208 Ala. 213, 93 So. 908, 910, the rule was again recognized, the court saying: "It is true, the respondent testified that the Powell wife was given a divorce, but claims that his father was not authorized to remarry. This restraint, however, if it existed, was not extraterritorial and did not invalidate his subsequent marriage in Tennessee."

Appellees would thrust aside these expressions of our court consistently adhered to throughout the years, with the statute remaining unchanged by legislative enactment, as mere dicta; but a study of the cases discloses that the question was in each instance appropriate for discussion and in some more directly involved. We construe these authorities as stating the settled rule of law upon that particular question which is also in harmony with the overwhelming weight of authority elsewhere.

■ But it is argued, and the learned chancellor so concluded, that the parties to this marriage went into Tennessee for the purpose of evading the law of Alabama; that the courts of this state cannot sanction such a procedure, and the marriage must therefore be declared a nullity.

The deceased, as the record discloses, was a prominent member of the bar and doubtless fully understood the inhibition against his remarriage in this state. Indeed, he had pursued a similar course as to his second wife whom he married in Indiana. As to petitioner, however, we entertain grave doubts to her full knowledge and understanding of the legal aspect of the situation or any actual intention upon her part to evade the law, and it has been held essential that both parties have such intention. Whippen v. Whippen, 171 Mass. 560, 51 N. E. 174. This question of fact, however, aside, and conceding the conclusion of the chancellor in this regard correct, we think the same result must follow. Among the early decisions in this country considering that phase of the question was Putnam v. Putnam, 8 Pick. (Mass.) 433, where the court said:

"In the case of Medway v. Needham, 16 Mass. 157 [8 Am. Dec. 131], it was decided that a marriage, which would be void if entered into within this state, was valid, being made in Rhode Island, where it was lawful, and

this, notwithstanding the parties went there for the purpose of doing what by the laws of this state was unlawful, and immediately returned to dwell within this state. This decision covers the whole ground of the present case, and to decide this against the petitioner would be to overrule that decision. The Court were aware of all the objections to the doctrine maintained in that case, and knew it to be vexata quaestio among civilians; but they adopted the rule of the law of England on this subject on the same ground it was adopted there, namely, the extreme danger and difficulty of vacating a marriage, which by the laws of the country where it was entered into was valid. The condition of parties thus situated, the effect upon their innocent offspring, and the outrage to public morals, were considered as strong and decisive reasons for giving place to the laws of the foreign country, not merely on account of comity, for that would not be offended by declaring null a contract made in violation of the laws of the state in which the parties lived, by evasion, but from general policy."

This authority was cited by this court in the early case of Reed v. Hudson, supra.

In Massachusetts, following the suggestion found in the opinion in the Putnam Case, supra, the rule was changed by legislative enactment (Commonwealth v. Lane, 113 Mass. 458, 18 Am. Rep. 509; Whippen v. Whippen, 171 Mass. 560, 51 N. E. 174), but no statute of like character has been enacted in this state, and the principle of law involved is therefore unaffected by any such consideration. The rule of the Putnam Case is sustained by the decided weight of authority. 19 Corpus Juris, 184; 38 Corpus Juris, 1278; Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; Moore v. Hegeman, 92 N. Y. 521, 44 Am. Rep. 408; State v. Shattuck, 69 Vt. 403, 38 A. 81, 40 L. R. A. 428, 60 Am. St. Rep. 936; Stevenson v. Gray, 17 B. Mon. (Ky.) 193; Dudley v. Dudley, 151 Iowa, 142, 130 N. W. 785, 32 L. R. A. (N. S.) 1170; Hoagland v. Hoagland, 27 Wyo. 178, 193 P. 843, 32 A. L. R. 1104; note to Atkeson v. Woodmen of the World, 32 A. L. R. beginning on page 1116, where many cases are reviewed; Harvey v. State, 31 Okl. Cr. 299, 238 P. 862, 51 A. L. R. 321; note, 70 A. L. R. 1036–1040. Mr. Freeman, in his note to the case of Estate of Stull, 63 Am. St. Rep. 776, page 785 has this to say:

"The rule established by the great weight of authority is opposed to the holding in the principal case, and is that a marriage good and valid by the laws of the state or country where it is entered into, is valid in every other state or country, although it appears that the parties thereto went into another state or country to contract such marriage, with an express view to evade the laws of their own country, the marriage in the foreign country or state must nevertheless be held valid in the country from which they departed for the purpose of marrying, and to which they returned to live: Monographic note to State v. Shattuck, 60 Am. St. Rep. 941, 942. In general this rule will not validate within a state marriages contracted without its borders which are prohibited by the laws of nature as generally recognized in Christian countries: Commonwealth v. Graham, 157 Mass. 73 [31 N. E. 706, 16 L. R. A. 578], 34 Am. St. Rep. 255; In re Wilbur's Est. [v. Bingham], 8 Wash. 35 [35 P. 407], 40 Am. St. Rep. 886. A further exception is made in the case of marriages which the local law-making power has declared shall not be allowed any validity, either in express terms or by necessary implication: See Pennegar v. State, 87 Tenn. 244 [10 S. W. 305, 2 L. R. A. 703], 10 Am. St. Rep. 648; In re Wilbur's Est. [v. Bingham], 8 Wash. 35 [35 P. 407], 40 Am. St. Rep. 886.

A more extensive note is found to State v. Shattuck, 60 Am. St. Rep. 936, where the author quotes freely from some of the leading cases, among them the early case from the Kentucky court of Stevenson v. Gray, 17 B. Mon. 193. The author of the note succinctly states the case and quotes from the opinion as follows:

"A marriage celebrated in Tennessee between a nephew and his uncle's widow, not prohibited by the laws of that state, must be held valid in Kentucky, though void if it had been celebrated therein, and though the parties were thus married to evade the law of the latter state, to which they returned and lived subsequent to such marriage: Stevenson v. Gray, 17 B. Mon. [Ky.] 193. 'The confusion and uncertainty with regard to the legitimacy of children, and the rights of property and succession, are not the only evils which would follow if the validity of a marriage were subject to be tried by the various laws to which the parties might at different times be personally subject. The fact that they have lived together as man and wife under a marriage actually and legally constituting that relation is in itself a most weighty consideration for giving effect in the case of marriage to the lex loci contractus, although its protection may have been sought for the single purpose of evading the law of the domicile to which the parties had been subject, and to which they intended again to subject themselves by a return to their domicile. Hence it has been decided repeatedly, both in England and America, that marriages celebrated in a neighboring country, which would have been illegal if celebrated at home, are there deemed valid, if they were legal at the place of celebration. Legislators have shown an unwillingness to require, or even to authorize, the disruption of a tie formed under such circumstances, by declaring it to be void, because, being made in fraud or evasion of

the law of the domicile, it may or should be regarded as if made under that law. Much more tender should a court be in bringing to the test of the domestic law, and for the purpose of vindicating its authority, a marriage lawful where it was consummated, and the condemnation of which, while not expressly required by the domestic law, must, if it produce no more distressing consequences, degrade the parties themselves by depriving their connection of legal sanction with which they intended and supposed it to be invested, and must shame the community itself and shock its moral sense by convicting it of having witnessed and countenanced a meretricious union and cherished in honor the guilty parties. It would confound the sense of right and wrong on a subject on which it is most important that it should be kept pure and distinct, if a marriage, lawful in Tennessee so long as the parties chose to remain there should become unlawful by their crossing the line into Kentucky, or if such a marriage, after being countenanced in this state for years, could be avoided as illegal and void from the beginning. And the result would be still more repugnant to the feeling and sense of justice of society if a marriage, not forbidden by the law of nature, clothed with the forms and solemnities required by law, followed by the birth of children, maintained in purity for years, and countenanced by the respect of society, could, after the death of one of the parties, be declared to have been from the beginning unlawful and void. Certainly, no support of a decision producing such a result can be found in the principles of the common law, and no court acting under its principles has yet made itself the instrument, without the express mandate of the statutory law, of thus desecrating the memory of the dead, and degrading the character of the living party. And we think it may be asserted that no court ever has gone, or ever will go, beyond the enactments of the legislature, either in annulling or in declaring or treating as null any marriage valid where it was celebrated, unless it be on the ground of polygamy, condemned not only by the municipal law, but by the concurrent sentiment of all christendom, or on the ground of incest, condemned by the law of nature, as indicated by the common sentiment of civilized and Christian men. We should not feel authorized, therefore, to pronounce this marriage void, and incompetent to confer the rights which, under our laws, are consequent upon a valid marriage, merely because, though celebrated in Tennessee, it may have been celebrated in fraud or evasion of our law, even though it were certain that we could now so declare and treat it if it had been a domestic marriage. The case is not one in which the court is to decide whether it will enforce or prevent the execution of a contract, but to say that a marriage, lawful where it was

actually celebrated, continued or sustained in this state for years without objection, until, by the death of one of the parties to it, it is actually terminated, shall now be treated as a nullity because it was an evasion of our prohibitory law. We should not consider ourselves at liberty so to treat it.'"

As holding a contrary view, we are cited to the Tennessee case of Pennegar v. State, 87 Tenn. 244, 10 S. W. 305, 2 L. R. A. 703, 10 Am. St. Rep. 648. While much stress is laid in the opinion upon the intent of the parties to evade the Tennessee law, yet we think it clear the foundation of the court's holding in fact rests upon the interpretation of the statute of that state which the court concludes declares the public policy of that state and by necessary implication applies to marriages wherever performed.

This is demonstrated, we think, by the later case of Newman v. Kimbrough (Tenn. Ch. App.) 59 S. W. 1061, 1064, 52 L. R. A. 668, where the court found there was no intention on the part of the contracting parties when they married in Texas to evade the law of Tennessee, but concluded nevertheless the marriage a nullity, saying: "On the same grounds of public policy that were declared in the case of State v. Bell, 7 Baxt. [Tenn.] 9 [32 Am. Rep. 549], we hold that, although it does not appear that there was an intentional evasion in the mere fact of marriage, the courts of this state will not recognize such a marriage as valid where the parties have immediately thereafter returned to this state to live, the wife who obtained the divorce being still alive." The case of State v. Bell, 7 Baxt. (Tenn.) 9, 32 Am. Rep. 549, referred to in the foregoing excerpt, concerned a marriage between a white man and a colored woman and the recognition of the validity of the same in Tennessee though valid where performed. The court declared the marriage void also in Tennessee upon the ground of public policy as declared by statute and decisions of the court of last resort of that state and the realization firmly fixed in the minds of the people of the Southern States that demoralization and debauchery are involved in such an alliance. State of Georgia v. Tutty (C. C.) 41 F. 753, 7 L. R. A. 50.

Like consideration in connection with section 5001, Code 1923, and the inhibitions against such alliance found in section 102 of our Constitution, would lead to a like result in this state. But such cases involve exceptions to the general rule that a marriage valid where made is valid everywhere, and we are here concerned with the one question as to whether or not by section 7410 of the Code we have so declared a pronounced public policy as to give to its inhibition against remarriage an extraterritorial operation, for it is recognized by the authorities generally that each state is a sovereign and a govern-

ment within itself and has the inherent power to determine the validity of a marriage of those domiciled within its borders, though performed elsewhere. So far as the statute is concerned, no question of morals or public policy appears to be involved, and nothing indicating an intention that it should be construed to apply beyond the borders of this State.

On the contrary, our decisions from 1848 to the present time have recognized it as the settled law of this state that such a statute had no extraterritorial effect. With this in mind, very clearly, a mere intention of the parties to guard against any nullification of a marriage performed in Alabama, by going into Tennessee where no such inhibition exists, could not be said to invalidate so solemn a contract and relationship, when they were but pursuing the course pointed out by the decisions of the Supreme Court of this state in reference to the very statute here considered.

Under these circumstances, it may, we think, more properly be said the marriage in Tennessee was not so much for the purpose of violating the Alabama law as it was for the purpose of validating their marriage. Doubtless many marriage relations have been entered into, children born of such union, and property rights determined, all upon the "settled rule" in this state that the inhibition of a statute as our own was to be given no extraterritorial operation. The Colorado court, in Griswold v. Griswold, 23 Colo. App. 365, 129 P. 560, 566, expresses this thought in the following language, pertinent here:

"By reason of the statute, and the strong preponderance of authority holding that marriages contracted outside the state are valid here, many such contracts have been entered into in good faith, not for the purpose of violating law, but for the purpose of making valid marriages, and we think much greater harm is likely to arise by declaring such marriages invalid than by adhering to the construction generally given to such statutes. As was said in the Estate of Wood,' supra [137 Cal. 129, 69 P. 900]: 'An opposite conclusion to that declared by the court would nullify hundreds of marriages, place the stamp of illegitimacy upon scores of children, and change the source of-title to great property interests. Unless the law plainly points to that end, such a conclusion should not be declared, and, as the court views the law, it is not plainly to that end, but plainly to the contrary.' If the law as herein declared need be changed, or modified, the remedy is with the Legislature."

Much evidence is in the record touching the illicit relationship existing between the parties before the marriage, and much stress is laid by counsel upon the moral aspect of the case. The question, however, is not one of private morals, but whether or not the contracting parties acted within their legal rights. It may properly be said in this connection that, however reprehensible petitioner's conduct may appear before the marriage, the record shows that during the few years she lived with decedent after the marriage, she was guilty of no misconduct, but, on the contrary, made him a good wife. But this is beside the mark.

We have read with much care the authorities cited in brief of counsel for the respective parties, and have considered the case with due regard to the importance of the decision to all parties concerned, and with due deference to the opinion and conclusion of the trial court. The conclusion has been reached that the marriage in Tennessee was valid and should be recognized in this jurisdiction, and that the decree therefore is laid in error. It will be here reversed, and the cause remanded to the court below to be proceeded with in harmony with the views herein expressed.

Reversed and remanded.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.