CHIEF JUSTICE WILLIAMS
deliveked the opinion op the court:
The testator, Paul Dannelli, was a native Italian, but naturalized citizen of the United States, who died a resident of Louisville, Kentucky, in the year 1865, having published his last will in the year 1856, just before his departure to visit Italy, by the fifth item of which he ’devised “the balance of my estate, real, personal, and mixed, exclusive of that herein devised and given to, or in trust for, my said wife, I give and devise unto my ’two brothers, Giacomo and Alexander, and my sister, Mary Marchand, to be equally divided between them; but should either of my brothers or sister die before me, then, and in that case, the children or heirs of such deceased brother or sister shall be entitled to that portion of my estate which their father or mother would have been in case he or she had survived me.”
The testator left a wife, but no children. His brother Alexander and sister Mary were residents of Kentucky, and his brother Giacomo, or James, resided in Milan, in the Province of Lombardy, then of Austria, now of Italy.
The testator left a large real and personal estate, and Aurelia Annunciata Agrani Luchina, wife of Casino Lu-china, claiming to be the child and heir of James Dannelli, asserts right to one third of the residual estate, which is resisted by Alexander Dannelli and Mary Marchand, who deny her legitimacy, or that she is at all the child of James Dannelli.
The evidence may be regarded as establishing the following facts, to-wit: That Aurelia’s mother was the *55 widow of a deceased brother, John Dannelli, who died in the year 1813; that she was born October 21, 1825, in Milan, and the next day placed on the wheel of “ The Pious Institution of the Exposed to the Wheel in St. Catharine,” an institution to prevent “ infanticide,” and where newly-born infants can be placed on a wheel which, by a horizontal rotary movement, carries the babe into the house without the exposure of the inmates to the person so placing the infant, or the latter to the inmates.
That those who wish at some future time to reclaim the infant, can have it identified by placing a mark on it, or depositing with it some writing or trinket. That with this infant there were placed means of identification ; that some three years afterward James Dannelli reclaimed the infant and took her over to the Province of Noviano, near Lake Como, some thirty miles from Milan, where the mother’s people resided; but with whom he placed her does not appear; that in the year 1827 he took Jane Dannelli, the mother, to some town in Switzerland and there married her, and they then lived as husband and wife, so recognized by their intimate neighbors and associates.
Mrs. Jane Dannelli, who was seventy-two years old when she gave her deposition, says Aurelia was permitted to remain in Noviano until 1849; she would then be about twenty-four years old. The weight of the evidence, however, renders it probable that Jane was mistaken as to this, and that she was taken home by James Dannelli when she was some fourteen years of age, which would make it about 1839. This, however, is not very important.
The reason assigned for the marriage in Switzerland was, because the canonical law of Lombardy, then a *56 Province of Austria, forbade the marriage with a deceased brother’s widow without a dispensation from the proper church authorities, which neither James nor Jane were able to purchase.
That, in the latter part of 1856, Paul Dannelli and his wife visited and remained in Milan some twenty-one months; were in daily intercourse with James and Jane and Aurelia; went walking with them; took Aurelia to the theatre; gave her presents in money and dressing; seemed proud of her; recognized Jane as the wife and Aurelia as the daughter of James. He then expressed a desire that she should be better educated, so as to write to him; expressed an anxiety that his brother should, by proper proceedings, adopt her as his daughter, that she might be legitimate, and expressed this desire, as she might thereby be an heir to himself.
In his' subsequent correspondence, after he left Milan for home, in his first letter written from Paris, France, he expressed to his brother his anxiety that Aurelia be adopted as his daughter; he recurred to this subject in his correspondence after arriving at home; directed that she should have twenty of the five hundred francs sent as a present to his brother; and on learning his brother’s death before the arrival of the letter, directed that she should have it all. He corresponded with her after his brother’s death in the latter part of 1859; sent her in one letter two hundred and twenty-three francs, at a time when he supposed he had lost his stock in the Louisville and Nashville Railroad, amounting to some eighty thousand francs, by its seizure and destruction by the Southern army ; and to these he subscribed himself, “ I am your uncle ; ” addressing her also as “ dearest Aurelia.”
James, by a public ac.t of record before a notary public, did adopt her as his daughter in September, 1859, but a *57 short time before his death, and willed to her and her mother all his estate.
Upon these facts several important legal questions arise. Whether Paul Dannelli knew, before his visit to Milan, that his brother James and sister-in-law Jane were living together as man and wñfe, and had a child which they recognized, does not appear; but that he did recognize this relation as husband and wife, and regarded Aurelia as their child on his visit there, and subsequently, is made manifest.
James was then far advanced in life, being sixty-odd years of age, and had never been otherwise married.
By the Austrian Civil Code, no one who had legitimate children could adopt; but an act of adoption, when allowed, secured all the rights of a legitimate child as between the “ adopted” and “ adoptive.”
By the Italian Civil Code, the adoption of an illegitimate child was forbidden; but not so by the Austrian Code, which must govern this case; for the Italian Code had no dominion over Lombardy until the year 1860.
It is insisted, that even if a marriage in Switzerland be established, yet, as the parties resided in Lombardy, the laws of the latter must govern as to legitimacy, and that they forbid it; and that if this be not so, still we cannot determine the laws of Switzerland, because not proved.
In Stephenson vs Gray (17 B. M., 203), this court adjudicated a question of the marriage of citizens of Kentucky who went to Tennessee, celebrated the rites of matrimony, and returned to Kentucky; continued to live together as husband and wife for many years; had offspring ; when the husband died. The wife, being the widow of the husband’.s deceased uncle, their marriage was interdicted by the Kentucky statute of 1798.
This court, in a labored opinion, held that the marriage, not being interdicted by the laws of Tennessee, was valid, *58 and that they were lawful husband and wife wherever they traveled, though it might have been their intention immediately to return to Kentucky, and cites with approbation the decision of Lord Stowell, in Dalrymple vs. Dalrymple (2 Hogg, 6 R., 54, 58), in which he held that Miss G.’s marriage must be tried by the laws of Scotland, ■where it occurred, he saying that the parties gained a forum in the place of marriage, and became entitled to the benefits of its laws.
This court also said, especially in Kentucky it is the settled law, that a marriage valid in the country where celebrated is to be held valid in other countries where the parties may be domiciled, though it would have been invalid by the law of the subsequent domicil if it had been originally celebrated there; but that cases of polygamous and incestuous marriages are exceptions, however. As to the latter class, the exceptions hold good only as to such as are manifestly contrary to the law of nature and subversive of the good order of society, and are alike condemned by the common sentiment of all civilized and Christian nations. As between lineal ascendants and descendants, this condemnation makes no discrimination founded on nearness or remoteness of degree; but as to collaterals, it goes no further than to prohibit mamage between brothers and sisters.
The British courts have departed from the general rule, that the lex loci contractus must govern the validity of foreign marriages to sustain such a marriage between British subjects, but never for the purpose of avoiding it.
The court regarded the general rule, both in England and America, as sustaining the validity of a marriage if legal at the place of celebration, although it would have been illegal if celebrated at home, and referred to. (Bishop on Marriage and Divorce, secs. 125, 126; 16 Mass. *59 R., 157; 8 Pick., 423; 1 Pick., 506; Bullen N. P., 114; Story's Conflict of Laws, secs. 123, 123a, b; 2 Kent's Com., sec. 16.)
Mere canonical disabilities, growing out of relationship by marriage, rendered the marriage voidable, but not void; hence, as the court said, such marriages remained good until set aside by an ecclesiastic sentence, according to the English doctrine.
As both reason and authority regard the assent of parties, and the consummation thereof by cohabitation, as a legal valid marriage, unless prohibited by the municipal laws of the country where celebrated, before we could pronounce this marriage as invalid, the laws of Switzerland making it so would have to be made known to us in a legal manner. -
This marriage put an end to the illicit intercourse, even if it be conceded that it had so been up to this period, as was decided by the appellate court of New York in Caujolle vs. Ferrie (23 N. Y. R., 95), and rebutted the presumption of continued illicit conduct arising from the previous illicit cohabitation.
The declaration of parties, if deceased, that they were married, provided they were made ante litem motam, are admissible evidence of the fact declared. Such declarations, made by the parents in life, are admissible as evidence to establish the legitimacy of their issue. (Goodright vs. Moss, Cowp., 591, and cases cited.)
The mere cohabitation of two persons of different sexes, or their behavior in other respects as husband and wife, always affords an inference of greater or less strength that a marriage has been solemnized between them. Their conduct being susceptible of two opposite explanations, we are bound to assume it to be moral rather than immoral, and credit is to be given to their own asser *60 tion, whether express or implied, of a fact peculiarly within their own knowledge. (Hubback on Successions, 248; Rex vs. Stockland, Burr's S. C., 508; 1 W. Bl., 367; Revel vs. Fox, 2 Ves., sr., 270; Hervey vs. Hervey, 2 W. Bl., 877; 23 N. Y., 104.)
The law is unwilling to bastardize children, and throws the proof on th'e party who alleges illegitimacy; and in the absence of. evidence to the contrary, a child co nomine is therefore legitimate. (2 Hogg C. R., 197; 4 Eng. Eccl. R.; 13 Ves., 145; 23 N. Y., 107.)
In Vowls vs. Young Lord Chancellor Erskine said, as to proof of actual marriage, that the evidence, especially in cases of obscure families, must be very slight, and Starr vs. Peck, 1 Hill, sustains the same rule.
And the presumption of law is not lightly to be repelled; it is not to be broken in upon or shaken by a mere balance of probabilities; the evidence for repelling it must be strong, satisfactory, and conclusive. (Lord Lyndhurst, in Morris vs. Davis, 5 Cla. & Fin., 163; also Piers vs. Piers, 2 H., of Lord's Cases, 331; 23 N. Y., 109.) The presumption arising from the conduct of the parents, from the continued recognition of her as their child, at least from the year 1849, the actual proof of the Switzerland marriage, is not rebutted by the necessary statement of James Dannelli, in the document of adoption, that Aurelia was of unknown parentage, especially as he therein says he has borne her affection from infancy; and when these statements were necessary to accomplish the desired object on his part, and the cherished object on the part of his brother Paul, and stronger still, as he told the notary public that she was his daughter and explained his object.
The language of this adoptive document, together with his will, are all accounted for by reason of the non *61 recognition of this marriage by the canonical law of Lombardy. By the laws of Kentucky, this actual marriage and subsequent recognition alone would legitimatize Aurelia; but when the parents lived together as husband and wife over thirty jmars, recognizing her as their child, and then James taking measures to make her a legitimate heir and adopted daughter, at the earnest solicitation of the testator, Paul, who also recognized the relation of husband and wife between these parents, and recognized and accepted her as his niece, how infinitely stronger becomes the moral as well as legal aspect of her cause.
f As by the laws of Kentucky she must be regarded as legitimate,- even if it were certain beyond a doubt that she would not be so regarded in Lombardy, we are not bound, by mere comity, to administer the canonical laws of the hierarchy of that country, so flagrantly repugnant to the genius of our American institutions and the laws and polity of our own State.
Story, in his “ Conflict of Laws” (section 479a), says as to wills: “ The general rule of the common law is, that it is to be construed according to the law of the place of his domicil in which it is made.”
And again (section 479c), he says: “ The same rule applies to the ascertainment of the persons who are to take under a will or testament; when it is made by the words designating a particular class or description of persons, who are the proper persons to take under the designatio personam is a point to be ascertained by the place where the will is made and the testator is domiciled.” As, if a person domiciled in England should bequeath his personal estate to his heir-at-law, the eldest son would take; but if domiciled in some of the American States, all the living children, and those representing deceased children, would *62 take; and if domiciled in Holland, he should bequeath to the “ male children,” and the question should arise whether descendants claiming through male children were entitled, this must be settled by the laws of Holland. And in section 479h Story says : “ The same rules of construction will generally apply to wills and testaments of unmovable property, unless, indeed, it can be clearly gathered from the terms used in the will that the testator had in view the law of the place of the situs. * * * * So if a testator should devise his real property .to his next of kin, who would be entitled, would depend upon the construction given to the words by the law of his domicil.”
In this case, the law of both the testator’s domicil and situs of real estate regard Aurelia as a legitimate child and heir of her father, James Dannelli.
Story shows the reasonableness of this rule of construction by supposing a testator had realty situated in three different countries, all differing as to the meaning of the term “children” or “heirs,” Are the same words in the same instrument to have three distinct and different meanings attached, or shall the meaning attached by the laws of the domicil prevail? Would it not be reasonable to presume the testator knew the meaning attached by the laws where he resided, and used them in the same sense? For the same views, reference is made to 4 Burge, Comm. on Col. and For. Law, pt. 2, ch. 4, sec. 5, p. 169; 2 do., pp. 857-8; Yates vs. Thompson, 3 Clarke & Fincle, 544, 583, 589; Trotter vs. Trotter, 3 Wills & Shaw, 407; S. C., 4 Bligh’s R. (N. S.), 502, 505.
And, as Redfield on the Law of Wills (chap. 9, sec. 30c) says, “there is no better principle in regard to all rules of construction, whenever applied, than to use them as helps and assistants towards reaching the intent of the testator.”
*63 Here the rules of construction and the facts all tend to establish the same thing, that Aurelia was regarded by the testator as the child and heir of his deceased brother James.
It is said, that when he made the will, however, it does not appear he knew of Aurelia; nor does it appear he was ignorant of her. She had then been living with her father at least seven years. The natural presumption is, he did have reasonable information and knowledge of his relatives. His affection and solicitude for James and his family certainly indicates anything but indifference. But that his knowledge was perfect as to Aurelia and her relations to her parents from his visit to Milan in the latter part of 1856, until his death in 1865, does abundantly appear; and though his brother James’ death had been known to him for six years, he never altered his wall devising James’ part to his “ children or heirs,” in case he should die before testator. Had he not intended Aurelia to take, it would have been most reasonable, after James’ death, he should have added a codicil, devising his whole estate to his surviving brother and sister.
The presumptions of our law'-, and the proven and presumed intention of the testator, perfectly harmonize. As our law presumes Aurelia to be the legitimate child of James Dannelli, and the facts tend strongly to establish that the testator so regarded her, and intended that she should take under his will as the child and heir of her deceased father, it is useless for us to investigate whether, as adopted child and legal heir of James Dannelli, she could take, had she not been of blood kin to testator or his brother James.
Wherefore, the judgment is affirmed.