STATE *vs.* ADDIE SHATTUCK.

May Term, 1897.

Present: Ross, C. J., ROWELL, TYLER, START and THOMPSON, JJ.

*Adultery—Out-of-State Marriage—Statute Forbidding Remarriage.*

The guilty party to a decree of divorce, forbidden by our statute to remarry, may nevertheless remarry in New Hampshire, the laws of that state permitting, and the marriage will be recognized here, although both parties to the new marriage were all the while domiciled in this State.

The presumption is that the common law of a sister state is the same as our own, and statutes in restraint of marriage being exceptional, their existence is not to be presumed.

INFORMATION for adultery. Plea, not guilty. Trial by jury at the December Term, 1896, Windsor County, *Munson*, J., presiding. Verdict, guilty. Judgment, sentence and execution thereon at request of the respondent without waiving exceptions. The respondent excepted.

*W. B. C. Stickney* for the respondent.

It was for the State to show that Coburn was competent to marry by the laws of New Hampshire. It was an essential fact, and there is no presumption. *Taylor* v. *Boardman*, 25 Vt. 581, 586. As to the law of New Hampshire, see *True* v. *Ranney*, 21 N. H. 52: 53 Am. Dec. 164; *Emerson* v. *Shaw*, 56 N. H. 418.

The New Hampshire marriage was illegal in Vermont. V. S. 2703, 2704, 5056. The statute does not limit the disqualification. The correct principle is, that if a marriage is absolutely prohibited in any country as being contrary to public policy and leading to social evils, the domiciled inhabitants of that country cannot be permitted, by passing the frontier and entering another state, in which the marriage is not prohibited, to celebrate a marriage forbidden in their own state, and immediately returning to their own state to insist on their marriage being recognized as lawful. *Brook* v. *Brook*, 9 H. L. Cas. 219; *Pennegar* v. *State*, 87 Tenn. 244: 2 L. R. A. 703; *Barney* v. *Cuness*, 68 Vt. 51.

*J. G. Harvey*, State's Attorney, and *W. W. Stickney*, for the State.

A marriage, valid where it is contracted, is valid here, although the parties intended to evade our laws, unless the statutes declare such a marriage void or the marriage is deemed contrary to the law of nature. II Kent, Com. 91; *Com.* v. *Graham*, 157 Mass. 73; *Putnam* v. *Putnam*, 8 Pick. 433; *Thorp* v. *Thorp*, 90 N. Y. 602; *Roberts* v. *Railroad Co.*, 34 Hun. 324; *Dickson* v. *Dickson*, 1 Yerg. 110: 24 Am. Dec. 444; *West Cambridge* v. *Lexington*, 1 Pick. 505: 11 Am. Dec. 231; *Sutton* v. *Warren*, 10 Met. 451; *Stevenson* v. *Gray*, 17 B. Mon. 193; *Dannelli* v. *Dannelli*, 4 Bush. 61; *Van Storch* v. *Griffin*, 71 Pa. 240; *Medway* v. *Needham*, 16 Mass. 157: 8 Am. Dec. 131; *Phillips* v. *Gregg*, 10 Watts. 158: 36 Am. Dec. 158; *State* v. *Patterson*, 2 Ired. 346: 38

Am. Dec. 699;  *VanVoorhis*  v.  *Brintnall*, 86 N. Y. 18: 40 Am. Rep. 505;  *Moore*  v.  *Hegeman*, 92 N. Y. 521: 44 Am. Rep. 408.

The Vermont statute contains no express prohibition of such a marriage as this, and  *Ovitt*  v.  *Smith*, 68 Vt. 35, where the marriage was celebrated in this State, has no application.  V. S. 2703, 2704.

ROWELL, J.  The charge is that the prisoner, an unmarried woman, committed adultery with Coburn, a married man.

It appeared that Coburn's first wife, who is still living, obtained a divorce from him in this State in December, 1895; that on June 13, 1896, he and Grace Hoisington, both of whom were then domiciled in Windsor, in this State, went to Claremont, New Hampshire, and were there married by a clergyman authorized by the law of that state to solemnize marriages; and that immediately after the marriage they returned to Windsor, where they have lived ever since, and where they first cohabited as husband and wife, never having cohabited as such in New Hampshire.

The only evidence of the law of New Hampshire respecting marriages was chapter 174 of the Public Statutes of that state, entitled, "Marriages."  That chapter imposes no restraint upon remarriage by the guilty party to a decree of divorce.

The court charged the jury that if it found that the marriage ceremony was performed by the clergyman, and that he was authorized to perform it, as his testimony tended to show, and also found that the said Grace cohabited with Coburn under the belief that the marriage was legal, as her testimony tended to show,—the marriage was valid, and Coburn was a person with whom the crime of adultery could have been committed.  To this the prisoner excepted; and also, for that the court did not charge that there was no evidence in the case to show that Coburn, being disqualified by the laws of this State to

contract a lawful marriage, was, notwithstanding such disqualification, competent by the laws of New Hampshire to contract a lawful marriage, and that without such testimony, the fact of his marriage to said Grace was not made out.

This last exception is not sustainable. As we have said, the chapter of the New Hampshire statutes put in evidence is not restrictive in this behalf; and if it be said that some other part of the statutes may be, the answer is, that as such restrictions upon marriage are exceptional, the burden was on the prisoner to show the restriction, if any there is. *Hutchins* v. *Kimmell*, 31 Mich. 126, 132. And as no such restriction exists in the common law of this State, the presumption is that the common law of New Hampshire is like ours in this regard. *Ward & Co.* v. *Morrison*, 25 Vt. 593, 601.

The marriage in question must, therefore, be taken to be valid by the law of New Hampshire. But had it been celebrated in this State, it would been void here, for our statute provides that it shall not be lawful for a divorced libellee to marry a person other than the libellant for three years from the time the divorce is granted, unless the libellant dies, and imposes a penalty on a person who violates that provision, or lives in this State under a marriage relation forbidden by it; and we have recently held that a marriage celebration in this State in violation thereof, between parties domiciled here, was void here. *Ovitt* v. *Smith*, 68 Vt. 35.

The prisoner claims that this marriage is void here notwithstanding it was celebrated in New Hampshire and is valid there, for that when a marriage is absolutely prohibited in a state or country as being contrary to public policy and leading to social evils, the domiciled inhabitants of that state or country cannot be permitted, by passing the frontier and entering another state in which the marriage is not prohibited, to celebrate a marriage forbidden in their

own state, and immediately return to their own state, to insist on their marriage being recognized as lawful.

It is the common law of Christendom, that as to form and ceremony, a marriage good where celebrated is good everywhere. But as to capacity to marry, the authorities are not agreed, some holding that, as in other contracts, it depends upon the law of domicil, and some, that it depends upon the law of the place where the marriage is solemnized, as do form and ceremony, and that a marriage good where celebrated is good everywhere, unless odious by the common consent of nations, or positively prohibited by the public law of a country from motives of policy. It is undoubtedly true that states may control this matter by statute, as Massachusetts does, where it is enacted that when persons resident in that state, in order to evade its marriage laws, and with an intention of returning to reside there, go into another state or country and are married, and afterwards return and reside in Massachusetts, the marriage shall be deemed void.

We have no such express provision. The language of our statute is general, and it is a fundamental rule that no statute whether relating to marriage or otherwise, if in the ordinary general form of words, will be given effect outside of the state or country enacting it. To bind even citizens abroad, it must include them, either in express terms or by necessary implication. Hence if a statute, silent as to marriages abroad, as ours is, prohibits classes of persons from marrying generally, or from intermarrying, or declares void all marriages not celebrated according to prescribed forms, it has no effect upon marriages, even of domiciled inhabitants, entered into out of the state. Those marriages are to be judged of by the courts of such state just as though the statute did not exist. If they are valid by the international law of marriage and the local law of the place where celebrated, they are valid by the law of such state, and the statute has nothing to do with the question,

if such international law is a part of the law of the state, as it is here, for a written law not construed to be extra-territorial does not change the unwritten law as to extra-territorial marriages; and therefore parties who are under no disability by international law, may choose their place of marriage, and if the marriage is valid there, it will be valid everywhere, though they were purposely away from home, and the same transaction in the state of their domicil would not have made them married.    There is, therefore, no foundation for an argument based simply on the idea of an evasion of the law of domicil.

This doctrine is entirely applicable to statutes prohibiting marriage after divorce.    Such statutes are not extra-territorial, unless made so by express words or necessary implication, as has been frequently held in this country, though there are cases the other way, among which is the recent and well-considered case of *Pennegar and Haney* v. *The State*, 87 Tenn. 244, where the cases adopting the same view will be found.    But the weight of American authority, as well as reason and analogy, sustain the proposition stated.

This whole subject is very fully and satisfactorily discussed by Mr. Bishop in chapter 39 of the first volume of his work on Marriage, Divorce, and Separation; and as we adopt his views, an extended discussion here is not necessary.    The subject is also fully discussed in *Commonwealth* v. *Lane*, 113 Mass. 458, and *Ross* v. *Ross*, 129 Mass. 243.    In the latter case it is said that the relation of husband and wife being based upon the contract of the parties and recognized by all Christian nations, the validity of the contract, if not polygamous nor incestuous according to the general opinion of Christendom, is governed, even as regards the capacity of the parties, by the law of the place of marriage; that this status, once legally created, should be recognized everywhere as fully as if created by the law of the domicil; and that therefore such a marriage, if valid by the law of the place

where contracted, even if contracted between persons domiciled in Massachusetts and incompetent to marry there, is valid there to all intents and effects, civil and criminal, except so far as the legislature has clearly declared that such a marriage out of the Commonwealth shall be deemed invalid.

The same doctrine is held in *VanVoorhis* v. *Brintnall*, 86 N. Y. 18, where it is said that in the absence of express words to that effect, it is not 'to be inferred that the legislature intended its enactments to contravene the *jus gentium* under which the question of the validity of the marriage contract is referred to the *lex loci contractus*, and which is made binding by the consent of all nations, and professedly and directly operates upon all, and that, while every country can regulate the status of its own citizens, until the will of the state finds clear and unmistakable expression to the contrary, that law must control. Judge Marshall says in *United States* v. *Fisher*, 2 Cranch, 389, that "Where rights are infringed, where fundamental principles are overthrown, where the general system of the law is departed from, the legislative intent must be expressed with irresistible clearness, to induce a court of justice to suppose a design to effect such objects."

*Brook* v. *Brook*, 9 H. L. Cas, 193, sustains the prisoner's contention. There a man and his deceased wife's sister, both of whom were lawfully domiciled British subjects, went temporarily to Denmark and were there married, where their marriage was valid; but it was held void in England, because an English statute prohibited such marriages. The law Lords delivered separate opinions, and the only ground upon which they agreed was, that as the statute made such marriages between English subjects domiciled in England void because declared by the act to be contrary to the law of God, it must be construed to include such marriages though solemnized abroad. Judge *Gray* says in *Commonwealth* v. *Lane*, above cited, that the

judgment in that case proceeds upon the ground that an act of Parliament is not merely an ordinance of man, but a conclusive declaration of the law of God; and that the result is that the law of God, as declared by act of Parliament and expounded by the House of Lords, varies according to time, place, length of life of parties, pecuniary interests of third persons, petitions to human tribunals, and technical rules of statutory construction and judicial procedure.

Mr. Bishop criticises the case very sharply, and says it is of the highest importance that it be sufficiently understood in this country to avoid any accident of its being followed by our courts.   He discusses it very fully, admitting that it was difficult for him to write soberly about it, as the decision was announced in apparent oblivion of the course that justice had taken for ages in England, and ignored alike acts of Parliament and judicial decisions.   To follow it, he says, would lead us into a confusion not to be endured where marriage, good order, and Christian decency are respected.

The French law is much like the English in this regard, though more exacting.   By the *Code Napoleon*, a marriage contracted in a foreign country between French people, or between a French person and an alien, is valid if it has been celebrated in the manner followed in such country, provided it has been preceded by the publication required by the *Code*, and provided the French person has not violated the provisions of the *Code* concerning the qualifications and conditions required to contract marriage.  Cachard's French *Civil Code*, Art. 170.

This accords with the further provision of the *Code*, that laws relating to the status and capacity of persons apply to Frenchmen even resident in a foreign country.   Ib. Art. 3. On this principle the civilians generally, we think, hold that as to capacity to marry, the law of the domicil governs.

But the other view, as suggested by Judge *Story*, is founded upon a more liberal basis of international policy that

deems it far better to support as valid mariages celebrated in another state or country when in conformity with the laws thereof, although some minor inconveniences may arise therefrom, than to shake general confidence in such marriages, to subject the innocent issue to constant doubts as to their legitimacy, and to leave the parties themselves at liberty to cut adrift from their solemn obligations whenever they happen to become dissatisfied with their lot. Conf. of Laws, pl. 124.

> *Judgment that there is no error in the proceedings of the county court, and that the prisoner take nothing by her exceptions.*