[No. 3591.]

GRISWOLD v. GRISWOLD.

1. STATUTES—*Implied Repeal.* Of two statutes which conflict the latter in time prevails and repeals the former.

But implied repeals are not favored, and if possible, conforming to the recognized canons of interpretation, both statutes should be given effect.

2. MARRIAGE—*In Another Jurisdiction in Violation of Local Prohibition.* A statute enacted in 1861, and ever since in force, provided that marriages contracted without this state and valid by the laws of the country where solemnized shall be valid in all courts within this state. (Rev. Stat., sec. 4165.)

Another statute adopted in 1893 provided that the court granting a divorce should, where no appeal or writ of error was prosecuted, have power to vacate the decree and reopen the cause at any time within one year from the date of the decree, upon application of the defeated party, showing cause, and that, "during said period of one year from the granting of decree of divorce neither party thereto shall be permitted to re-marry to any other person." (Rev. Stat., sec. 2122.)

A divorced woman, a domiciled citizen of Colorado, obtained a divorce in the courts of Colorado, and on the same day went to New Mexico and was there united in marriage with another citizen and resident of Colorado. They immediately returned to Colorado and there continued their residence. The decree of divorce contained no words prohibiting a second marriage. The marriage in New Mexico was a lawful marriage according to the laws of that jurisdiction.

Considering the long established policy declared in the statute first enacted; that the later statute was not expressly made applicable to marriages without the state, did not in terms suspend the operation of the decree of divorce, did not denounce as void a marriage entered into contrary to its prohibition, and manifested no purpose to repeal the former statute, it was *held* that the marriage in New Mexico, being valid by the laws of that state, must be regarded as valid here.

*Appeal from Prowers District Court.* HON. HENRY HUNTER, Judge.

Mr. J. W. TODD, Mr. O. G. HESS, for appellant.

Messrs. MERRILL & McCARTY, Mr. A. WATSON MCHENDRIE, for appellee.

KING, J., delivered the opinion of the court.

At all times hereinafter mentioned the plaintiff and the defendant were residents of Prowers county, Colorado. On the 20th of August, 1908, at Raton, New Mexico, a contract of marriage was made and entered into by and between plaintiff and defendant, and duly sol-

emnized by a civil magistrate of that territory. Thereafter they lived and cohabited together as husband and wife for a period of some months, until as a result of said marriage plaintiff became pregnant, following which the defendant, after a brief period of cruel treatment of plaintiff, permanently deserted her. She brought this suit in the district court in and for said Prowers county for divorce and alimony, which, on November 24th, 1909, resulted in a verdict and judgment in her favor.

For a special and affirmative defense, defendant alleged that on the 20th day of August, 1908, in said Prowers county, plaintiff herein was granted a decree of divorce by the county court of said county from one Warren W. Young, theretofore her lawful husband, and that "the said plaintiff and the said Warren W. Young were thereby freed and absolutely released from said bonds of matrimony and from all rights and claims accruing to either of said parties by reason of their marriage to each other;" that subsequently and on the same day, plaintiff and defendant, for the purpose of evading the provisions of the laws of Colorado prohibiting the marriage of a party to a divorce within one year from the date of said decree, went to the town of Raton in the territory of New Mexico and had the ceremony of marriage performed, and immediately returned to said Prowers county, where they have since resided. These allegations were not denied. The decree offered in evidence is absolute in form and contains no prohibition against remarriage of the parties thereto. It does not appear that the decree was appealed from, or in any manner assailed.

The sole question presented, and necessary for determination on this appeal, is the validity of the marriage contract entered into in New Mexico within one year from the date of the decree of divorce dissolving

the bonds of matrimony theretofore existing between plaintiff and her first husband, when such marriage contract is called in question, in the courts of this state, by a party thereto. Its determination depends upon the construction of section 2122, Revised Statutes of 1908, and its effect upon marriages contracted in another state, when considered in connection with section 4165 of said statutes. Section 4165 is a part of a chapter concerning "marriages," and is as follows:

"All marriages contracted without this state, which shall be valid by the laws of the country in which the same were contracted, shall be valid in all courts within this state; Provided, nothing in this section shall be construed so as to allow bigamy or polygamy in this state."

Section 2122 is a part of "An Act to Provide for a System of Practice and Procedure in Relation to Divorce and Alimony, and to Repeal Certain Acts in Conflict Therewith," approved April 3rd, 1893, and is as follows:

"In case no appeal or writ of error shall be taken from a decree of the court granting a divorce, the court shall have power to set aside such decree and re-open such case at any time within one year from the date of entering such decree, upon application of the defeated party under oath showing good reason therefor; but if no such application be made within such time, or the same be denied, then such decree shall never be re-opened for any cause; *and during said period of one year from the granting of a decree of divorce, neither party thereto shall be permitted to remarry to any other person.*"

In *Mock v. Chaney*, 36 Colo., 60, the supreme court, speaking by Mr. Justice Steele, said that "very many intricate questions of law and public policy are involved in a consideration of the question presented concerning

the validity of a marriage in New Mexico within one year from the granting of a divorce in this state." The public policy of the state, as to the matter under consideration, is declared in the two sections of the statutes hereinbefore quoted. The first has been a part of the statute on that subject since territorial days, and declares and expressly adopts as the law and public policy of this state, the *jus gentium,* or law of nations, by which the validity of the marriage contract is referred to the *lex loci contractus,* and which is made binding by the common consent of all nations—the public policy of the civilized world. The second, so far as the clause prohibiting remarriage of parties divorced is concerned, was not in the statutes prior to 1893. And if said last named provision is given extra-territorial effect, or is held to apply to and invalidate or affect a marriage of citizens of this state contracted in another state, it is clearly in conflict with the provisions of said section 4165, as well as with the *jus gentium,* and being the later declaration, would operate as an amendment to, or repeal in part of, said former section, as to marriages made within one year from the date of divorce.—*Purmort v. Tucker Lumber Co.,* 2 Colo., 470; *Branagan v. Dulaney,* 8 Colo., 408, 412; *Calhoun G. M. Co. v. Ajax G. M. Co.,* 27 Colo., 1, 14. But repeals by implication are not favored. In view of the apparent conflict, it is the province and duty of the court to ascertain whether both sections of the statute may not be so construed as to be given full force and effect, in conformity with recognized and approved rules of statutory construction and interpretation.

The provision of section 2122, prohibiting remarriage within one year, is general in its terms, contains no exceptions as to the place where such contract may be entered into, and therefore *prima facie* applies to and includes such marriages everywhere—out of this state

as well as within its borders. But this section contains no words expressly making it extra-territorial in effect, or declaring such marriage void, or which evidence an intention to repeal section 4165 or to in any manner affect it.

The following rules of construction are in point:

"Generally words are not to be so construed as to alter the previous policy of the law, unless no sense or meaning can be put upon them consistent with the intention of preserving the existing policy untouched."

"After a statutory policy has long been established and is well defined, it will not be presumed to be departed from or abandoned."—Lewis' Sutherland on Statutory Construction, 2nd ed., vol. 2, sec. 581.

Statutes in derogation of common law are to be strictly construed.

"In the absence of words express and conclusive, admitting of no other interpretation, a court will not presume that the legislature intended to command the judicial tribunals to violate the established principles of law and even the law of nations; so that a statute in general terms yet susceptible of a reasonable application without being carried so far, will be restricted by construction to a narrower sense consistent with the law of nations."—Bishop on Marriage, Divorce and Separation, vol. 1, sec. 835.

"Where fundamental principles are overthrown, where the general system of laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects."—Chief Justice Marshall in *U. S. v. Fisher*, 2 Cranch, 389; *Van Voorhis v. Brintnall*, 86 N. Y., 18, 37.

Upon the question involved herein, the authorities are not entirely harmonious, but in the construction of this statute, and in its application to the facts of this case, we follow and adopt the reasoning of, and the rules laid down by, the following authorities, text-writers and court decisions: 2 Kent's Commentaries, 14th ed., p. *93; Bishop on Marriage and Divorce, vol. 1, secs. 283, 286 and 306a; *State v. Shattuck,* 69 Vt., 403, 40 L. R. A., 428; *Conn v. Conn,* 2 Kan. App., 417, 42 Pac., 1006; *Mason v. Mason,* 101 Ind., 25; *Park v. Barron,* 20 Ga., 702; *Medway v. Needham,* 16 Mass., 157; *Commonwealth v. Lane,* 113 Mass., 458; *Ross v. Ross,* 129 Mass., 243; *Van Voorhis v. Brintnall, supra; Stevenson v. Gray,* 17 B. Mon. (Ky.), *193.

Kent, in his Commentaries, 2nd volume, 14th edition, pp. *92 and *93, says:

"As the law of marriage is a part of the *jus gentium,* the general rule undoubtedly is, that a marriage, valid or void by the law of the place where it is celebrated, is valid or void everywhere. An exception to this rule is stated by Huberus, who maintains that if two persons, in order to evade the law of Holland, which requires the consent of the guardian or curator, should go to Friesland, or elsewhere, where no such consent is necessary, and there marry, and return to Holland, the courts of Holland would not be bound, by the law of nations, to hold the marriage valid, because it would be an act *ad eversionem juris nostri.* In opposition to this opinion, we have the decision of the court of delegates in England in 1768, in *Compton v. Bearcroft,* where the parties, being English subjects, and one of them a minor, ran away, without the consent of the guardian, to avoid the English law, and married in Scotland. In a suit in the spiritual court, to annul the marriage, it was decided that the marriage was valid. This decision of the spir-

itual court has been since frequently and gravely questioned. Lord Mansfield, a few years before that decision of the delegates, intimated pretty strongly his opinion in favor of the doctrine in Huberus, though he admitted the case remained undecided in England. The settled law is now understood to be that which was decided in the spiritual court. It was assumed and declared by Sir George Hay in 1776, in *Hartford v. Morris* (Mass.) to be the established law. This principle is that, in respect to marriage, the *lex loci contractus* prevails over the *lex domicilii* as being the safer rule, and one dictated by just and enlightened views of international jurisprudence. This rule was shown by the foreign authorities referred to by Sir Edward Simpson in 1752 in the case of *Scrimshire v. Scrimshire* to be the law and practice in all civilized countries, by common consent and general adoption. It is a part of the *jus gentium* of Christian Europe, and infinite mischief and confusion would ensue with respect to legitimacy, succession and other rights, if the validity of the marriage contract was not to be tested by the laws of the country where it is made. This doctrine of the English ecclesiastical courts was recognized by the supreme court of Massachusetts in *Medway v. Needham* (16 Mass., 157, 8 Pratt, 433); and though the parties in that case left the state on purpose to evade its statute law, and to marry in opposition to it, and, being married, returned again, it was held that the marriage must be deemed valid, if it be valid according to the laws of the place where it was contracted, notwithstanding the parties went into the other state with an intention to evade the laws of their own. It was admitted that the doctrine was repugnant to the general principles of law relating to other contracts; but it was adopted in the case of marriage, on grounds of public policy, with a view to prevent the public mischief and the disastrous conse-

quences which would result from holding such marriages void. It was hinted, however, that this comity, giving effect to the *lex loci,* might not be applied to gross cases, such as incestuous marriages which were repugnant to the morals and policy of all civilized nations. This comity has been carried so far as to admit the legitimacy of the issue of a person who had been divorced *a vinculo,* for adultery, and who was declared incompetent to remarry, and who had gone to a neighboring state, where it was lawful for him to remarry, and there married.''

Bishop, in his work on Marriage and Divorce, lays down the rule that all such marriages are valid unless the statute contains some express words of nullity.

''Consequently, the doctrine has been established, that a marriage good at the common law is good notwithstanding the existence of any statute on the subject, *unless the statute contains express words of nullity.* This rule applies not only to the statute as a whole, but to the several parts of it; so that, if it declares the marriage void for non-compliance with a particular provision, it is good notwithstanding a failure to comply with any other provision.''—Sec. 283.

And distinguishing the marriage contract from other contracts, the author says:

''The rule of interpretation we are considering was admitted by Dr. Lushington not to be in accordance with the constructions which some other acts, relating to other subjects, have received; but, 'it must always be remembered,' he said, 'that marriage is essentially distinguishable from every other species of contract, whether of legislative or judicial determination; that this distinction has been universally admitted; that not only is all legal presumption in favor of the validity and against

the nullity of marriage, but it is so on this principle,—
that a legislative enactment to annul a marriage *de facto*
is a penal enactment, not only penal to the parties, but
highly penal to the innocent offspring, and therefore to
be construed, according to the acknowledged rule, most
strictly.' Thus, as already mentioned, negative and pro-
hibitive words in a statute are often held to render what
is done under them void, but in a marriage act they do
not have this effect.''—Sec. 286.

Upon the question of a prohibitory statute, such as
ours, and its effect upon a remarriage in the state as well
as out of it, it is said:

''If we are to look at this question as one of prin-
ciple, we must doubtless be governed in some measure
by the particular language of the statute. We have al-
ready seen that where, in England, the divorce act for-
bade a remarriage until the period for appeal had elapsed,
a marriage after sentence pronounced, and before the ex-
piration of this time, was held—and it is believed by the
author properly so—to be void. In the principal case
in which this was so adjudged, a doubt was expressed
whether, in the absence of any statutory provision on the
point, a divorce dissolving a valid marriage operates in
law to authorize the divorced parties to remarry. What-
ever foundation, or whether any, there may be for such
a doubt in England, there is none in this country; for,
with us, it was never questioned, that, in the absence of
all provision on the point, a divorced person, whether
plaintiff or defendant in the divorce suit, is entitled to
remarry the same as though the first marriage had never
existed. Now, if, after a system of divorce laws has been
established, and parties have sought and obtained di-
vorces, a statute should be passed forbidding any di-
vorced person to contract a new marriage, this statute
would subject the person violating it to indictment, even

though it was silent as to the penalty. Then, after the statute had thus expended itself, it could not on principle be carried further and render the marriage null, unless it also contained an express clause of nullity. There could be no doubt about this proposition as applied to divorces which had already occurred, and one cannot see why it should not apply equally to future divorces. On the other hand, if the same statute which authorized the divorce expressly provided that it should not operate to authorize the divorced party to remarry, the case would seem pretty plainly to fall within a principle already considered, and a new marriage contracted in the same state would be void; although it would be good if contracted in another state or country. It cannot be doubted that these two points, standing at the extremes, are correct as thus stated; but, between these points, there are various shades and kinds of statutory provisions, the effect of which may be more or less open to question.''— Sec. 306a.

Directly in point is the case of *State v. Shattuck, supra,* in which the supreme court of Vermont, upon a statute similar to ours, but containing a clause making the remarriage a felony, and applied to persons who left the state of Vermont, went to the state of New Hampshire and there had the marriage performed, for the sole purpose of evading the laws of their domicile, said:

''It is undoubtedly true that states may control this matter by statute, as Massachusetts does, where it is enacted that when persons resident in that state, in order to evade its marriage laws, and with an intention of returning to reside there, go into another state or country and are married, and afterwards return and reside in Massachusetts, the marriage shall be deemed void. We have no such express provision. The language of our statute is general, and it is a fundamental rule that no

statute, whether relating to marriage or otherwise, if in the ordinary general form of words, will be given effect outside of the state or country enacting it. To bind even citizens abroad, it must include them, either in express terms or by necessary implication. Hence, if a statute, silent as to marriages abroad, as ours is, prohibits classes of persons from marrying generally, or from intermarrying, or declares void all marriages not celebrated according to prescribed forms, it has no effect upon marriages, even of domiciled inhabitants, entered into out of the state. Those marriages are to be judged of by the courts of such state, just as though the statute did not exist. If they are valid by the international law of marriage and the local law of the place where celebrated, they are valid by the law of such state, and the statute has nothing to do with the question if such international law is a part of the law of the state, as it is here, for a written law not construed to be extra-territorial does not change the unwritten law as to extra-territorial marriages; and therefore, parties who are under no disability by international law, may choose their place of marriage, and if the marriage is valid there, it will be valid everywhere, though they were purposely away from home, and the same transaction in the state of their domicile would not have made them married. There is, therefore, no foundation for an argument based simply on the idea of an evasion of the law of domicile.''

Under the statutes of New Mexico (Compiled laws of 1897 and amendments thereto), marriage is a civil contract, for which the consent of the contracting parties capable in law of contracting is essential. And before persons can be lawfully joined in marriage, it is made the duty of the official or other person solemnizing the marriage to ascertain from the contracting parties that they are not, on any account, incapable of contracting

marriage, that they are free persons, and particularly that they are not in any way bound by marriage contract with any other person,—in other words, are unmarried. Plaintiff and defendant were free persons, of full age, of sound mind, under no restraint, consented to the marriage contract, secured license from an official authorized to issue the same, caused the marriage to be solemnized by a person duly authorized and qualified, and in every other respect, as to form and substance, complied with the laws of New Mexico, so that the said marriage was valid and of full force and binding effect in that territory, and therefore, was valid in this state, and must be so held by all of its courts under the express provision of section 4165 hereinbefore quoted; unless, by reason of the provision of section 2122 of our statutes, the plaintiff herein was rendered incapable, in law, of contracting marriage under the laws of New Mexico; and under the laws of that state such incapacity, as to the plaintiff herein, could only arise from the fact that the decree of divorce granted to her in Colorado did not dissolve the bonds of matrimony between her and her former husband, but left her still married; and this condition, if it existed, would, of course, render a second marriage in any state invalid.

The provision of our statute invoked for the purpose of nullifying the New Mexico marriage, while it forbids the parties to a divorce suit to remarry any other person within one year, does not in terms suspend the operation of the decree, does not denounce a remarriage within the prohibited time as void, or a nullity, nor make such act criminal, nor attach any penalty to a violation of such statute. (In this respect it contrasts with, and may be tested by, section 4163, prohibiting certain marriages and in terms declaring them absolutely void.) Nor does it in terms apply to such marriage elsewhere than in the

state of Colorado. It does not purport to suspend the operation of the decree. It deals with divorced persons. It expressly treats the marriage as dissolved, the decree absolute, final and conclusive, to the extent that even the parties thereto must contract a new marriage as between themselves if they wish to resume their marital relations. The statutory inhibition does not affect the decree.—*In re Woods' Estate,* 137 Cal., 129. This is admitted by defendant's answer.

Applying the rules of construction heretofore mentioned and adopted, we are constrained to hold that the prohibitory provisions of the statute do not apply to nor affect marriages contracted in any other state or country. It will be presumed that the law-making body, in enacting that provision, knew the law as declared by the courts of the several states with substantial uniformity for more than a century; that in the absence of express terms making the inhibition apply to foreign marriages, the effect thereof is restricted to those contracted within the state, and that the legislature so intended, and did not contemplate a repeal or modification of section 4165. The rule established by the preponderance of authorities, and we think the better rule, and therefore the one which we adopt, is that, if a statute, silent as to marriages abroad, prohibits classes of persons from marrying generally, or from intermarrying, it has no effect upon marriages, even of domiciled inhabitants, entered into out of the state. Those marriages are to be judged of by the courts just as though the statute did not exist, and this would be true even if the parties went into another state with the intention of avoiding the laws of their own. This rule is held to be the law by the authorities hereinbefore cited, as well as the following: *In re Woods' Estate, supra; Dumaresly v. Fishly,* 10 Ky., *369; *Clark v. Clark,* 52 N. J. Eq., 650; *Minor v. Jones,* 2 Redf. Sur. (N. Y.), 289;

*Phillips v. Gregg,* 10 Watts (Pa.), 158; *Campbell v. Crampton,* 2 Fed., 417; *Pearson v. Pearson,* 51 Cal., 120; *Dannelli v. Dannelli's Admr.,* 67 Ky., 51; *Fornshill v. Murray,* 1 Bland (Md.), 479; *Hutchins v. Kimmell,* 31 Mich., 126; *Johnson v. Johnson's Admr.,* 30 Mo., 72; *Frame v. Thormann,* 102 Wis., 653; *Ex parte Chace,* 26 R. I., 351; *Mason v. Mason, supra; Hills v. State,* 61 Neb., 589.

In *Conn v. Conn, supra,* under a statute prohibiting remarriage within six months after the decree, and providing "it shall be unlawful for either of said parties to marry, and any person so marrying shall be deemed guilty of bigamy," it was held that such inhibition applied only to marriages within the state, and did not declare an incapacity to contract marriage. In that case, and also in *State v. Walker,* 36 Kan., 297, the distinction was made between a statutory prohibition and a declaration of incapacity to contract.

The supreme court of California *In re Woods' Estate, supra,* under a statute in effect the same as ours, forbidding marriage within one year after divorce, and providing that such remarriage within the time named should be void, held that such statute had no extra-territorial effect, did not apply to a marriage contract entered into in the state of Nevada in evasion of that statute, and further, that said statute did not enter into and become a part of said decree so as to suspend the operation of the same during the year, but was a prohibition pure and simple against the marriage of either party within one year, the penalty for violation thereof being nullity of the marriage.

A number of well-considered cases take, or seem to take, a view exactly contrary to some of the decisions hereinbefore cited. The principal ones are: *Lanham v. Lanham,* 17 L. R. A., N. S. (Wis.), 804, 117 N. W., 787;

*Pennegar v. State,* 87 Tenn., 244, 2 L. R. A., 703; *McLennan v. McLennan,* 31 Or., 480, 38 L. R. A., 863; *In re Stull's Estate,* 183 Pa., 625, 39 L. R. A., 542. But an examination of these authorities will generally show that they were based upon statutes expressly declaring the marriages (1) void, or (2) declaring incapacity to contract, or (3) which by express terms suspended the operation of decrees of divorce, or were held to suspend it by necessary implication, or (4) such statutes were held to be declarations of public policy, superseding the *jus gentium* that a marriage valid where performed is valid everywhere. For instance, in Wisconsin the statute provides, "It shall not be lawful for any person divorced from the bonds of matrimony, by any court of this state, to marry again within one year from the date of the entry of such judgment or decree, and the marriage of any person solemnized within one year from the date of the entry of any such judgment or decree of divorce, shall be null and void"; and in passing upon the question, Chief Justice Winslow classified the exceptions to the general law that a marriage valid where celebrated is valid everywhere, as follows: (1) marriages contrary to the laws of nature as generally recognized by Christian civilized states; (2) marriages which the law-making power of the forum has declared shall not be allowed validity. It will be noticed that the Wisconsin statute contained express words of nullity.

In *McLennan v. McLennan, supra,* it is shown that the statute of Oregon declares that "no party shall be capable of contracting marriage with a third person, and if he or she does so contract, shall be liable therefor as if such decree had not been given until the suit has been heard and determined on appeal"; under which the court held that the declaration of incapacity to remarry within a fixed time, suspended the operation of the decree as

to both parties, and rendered them absolutely powerless to make a valid contract of marriage, and declared a well-recognized distinction between statutes which provide an incapacity for remarriage, and those which simply prohibit remarriage. At this point, however, we call attention to the fact that capacity·to marry is governed by the *lex loci contractus,* except general incapacity, such as extreme youth or mental incompetency to give consent, recognized everywhere; and that statutory incapacity is non-extraterritorial.

In *Pennegar v. State, supra,* the statute involved was, "When the marriage is absolutely annulled, the parties shall, severally, be at liberty to marry again; but a defendant who has been guilty of adultery, shall not marry the person with whom the crime was committed, during the life of the former husband or wife." After stating that the marriage, being prohibited by statute, would be void if solemnized in that state, the court classified the exceptions in substantially the same manner as stated by Chief Justice Winslow in *McLennan v. McLennan, supra,* except that the second was stated as follows: "Marriages which the local law-making power has declared shall not be allowed any validity, either in express terms or by necessary implication"; and after recognizing the extreme difficulty of solution of the question, and the conflicting decisions thereon, finally concluded that under the public policy of Tennessee the statutory inhibition was intended to be imperative, and sustained the prohibitory terms as against the *jus gentium.* It may be noted in passing that in no one of these decisions was there shown to exist a statute such as our section 4165, expressly declaring the *jus gentium* to be the public policy of the state.

In the *Estate of Stull, supra,* the marriage was with a former paramour, which marriage was specially pro-

hibited, and under which letters of administration were asked. The statute involved was that the wife or husband "who shall have been guilty of the crime of adultery shall not marry the person with whom the said crime was committed." In that case it was flatly held that a personal incapacity was imposed, and that the necessary meaning of the language of the statute was, that the parties should not marry at all, under any circumstances, at any time or place; that the relation itself was absolutely prohibited, and hence, within the words of the statute without reference to the place where marriage occurs.

But, as we have said, the great preponderance of authority, and we think the better reason, favors the position we have adopted. In Colorado we have two statutes of equal dignity, force and effect; one declaring that the courts shall give validity to marriages which are valid in other states where made, and the other prohibiting, generally, marriage of divorced persons for a specified time. Both declare the public policy of the state. The construction which we make, and which is clearly authorized by reason and authority, gives effect to both statutes and invalidates neither, in whole or in part. It is urged that if a marriage within the year is upheld, and thereafter the former divorce should be vacated, there would be two valid marriages, thus permitting bigamy or polygamy in contravention of law and the exceptions of the general provisions of said section 4165. Such cannot be the result. If the decree of divorce should be vacated, and the former marriage status reinstated, the second marriage becomes ipso facto void in this state, not because of anything existing in the statute under consideration, but because the former marriage relation has been duly declared not dissolved. The same condition would have existed before the statutory provision was enacted, and still is possible as to marriages after expiration of the prohibited time, in case of a reversal of said decree

upon appeal or review. By reason of the statute, and the strong preponderance of authority holding that marriages contracted outside the state are valid here, many such contracts have been entered into in good faith, not for the purpose of violating law, but for the purpose of making valid marriages, and we think much greater harm is likely to arise by declaring such marriages invalid, than by adhering to the construction generally given to such statutes. As was said in the *Estate of Wood, supra,* "an opposite conclusion to that declared by the court would nullify hundreds of marriages, place the stamp of illegitimacy upon scores of children, and change the source of title to great property interests. Unless the law plainly points to that end, such a conclusion should not be declared, and as the court views the law, it is not plainly to that end, but plainly to the contrary."

If the law as herein declared need be changed, or modified, the remedy is with the legislature. As was said by the supreme court of Massachusetts in 1829, in *Putnam v. Putnam,* 8 Pick., 433, speaking through Parker, chief justice, upon a similar declaration of the law: "If it shall be found inconvenient, or repugnant to sound principle, it may be expected that the legislature will explicitly enact, that marriages contracted within another state, which if entered into here would be void, shall have no force within this commonwealth. But it is a subject which, whenever taken into consideration, will be found to require the exercise of the highest wisdom." And it is worthy of note that the legislatures of Massachusetts, Kansas and other states, have provided remedies by explicit declarations of nullity, incapacity to contract, or suspending the operation of the decree for the prohibitive period, and making the prohibition expressly applicable to contracts of marriage without the state as well as within.

To summarize: 1. The marriage contract in question was valid under the laws of New Mexico, and therefore is valid in this state by virtue of express provision contained in section 4165 above quoted. 2. The provisions of section 2122, prohibiting remarriage within one year from date of divorce, have no extra-territorial effect, do not suspend the operation of the decree dissolving the bonds of matrimony, and do not affect the marriage contracted in New Mexico, nor in any manner repeal or amend said section 4165.

For the reasons given the judgment is affirmed.